683 A.2d 649

**Barbara L. POLERI and John Poleri, Appellants,**

v.

**Gene SALKIND, M.D., Patrick M. Sewards, M.D., Raymond LaFontant, M.D., and Moss Rehabilitation Hospital, Appellees.**

Superior Court of Pennsylvania.

Argued April 23, 1996.

Filed Aug. 27, 1996.

Reargument Denied Nov. 8, 1996.

Gregory F. Cirillo, Philadelphia, for appellants.

Francis J. McGovern, Blue Bell, for G. Salkind, M.D., appellee.

Barbara Magen, Philadelphia, for P. Sewards, M.D., appellee.

Joseph H. Foster, Philadelphia, for R. Lafontant, M.D., appellee.

Before McEWEN, P.J., and SAYLOR, and MONTEMURO *, JJ.

* Retired Justice assigned to Superior Court.

McEWEN, President Judge.

Appellants, Barbara L. Poleri and John Poleri, have taken this appeal from the order of May 23, 1995, which denied their motion for post-trial relief and affirmed the compulsory non-suit which had been entered in favor of appellees. We are constrained to vacate the order entering the compulsory non-suit and remand for a new trial.

The facts underlying the instant appeal have been aptly summarized in the opinion of the trial court:

> In 1988, 59 year-old plaintiff, Barbara L. Poleri, consulted her family physician, Dr. Kagen, regarding her history of back pain which began when she was a child. She told Dr. Kagen that her back pain had become "unbearable" and interfered with her daily activities. As a result, Dr. Kagen referred plaintiff to a proctologist, sent her for a CAT scan and an MRI, referred her to a rheumatologist and then to neurosurgeon, defendant Gene Salkind, M.D. She also sought the second opinion of defendant, Patrick M. Sewards, M.D., an orthopedic surgeon and associate of Dr. Salkind. Mrs. Poleri was diagnosed as suffering with spinal stenosis, a compression of the nerves of the lower back.

> As a result of Drs. Seward's and Salkind's recommendations that surgery was necessary to correct Mrs. Poleri's back problem, she was admitted to Germantown Hospital and Medical Center ("Germantown") on May 3, 1988; surgery was performed by Drs. Salkind and Sewards on May 4, 1988. Dr. Salkind performed a laminectomy, a decompression of the nerves. Dr. Sewards then performed a fusion of plaintiff's spine. The fusion involved harvesting bone from Mrs. Poleri's pelvis and grafting it to her spine.

> Plaintiff woke up after the surgery the following morning in pain. She did not recall Drs. Salkind or Sewards specifically examining her back wound after the operation, although she did recall nurses checking the wound. Plaintiff recalled seeing Drs. Salkind or Sewards at most a total of six times while she was hospitalized.

On May 9, 1988, plaintiff's back wound began to drain fluid causing her bandages to be replaced several times per day. On that same day, a culture of her urine was taken and it was discovered that she had a urinary tract infection. As treatment, Mrs. Poleri was prescribed the antibiotic norfloxacin. By the following day, plaintiff had developed a palpable hematoma, a collection of blood, at the operative site. Between May 10 and May 15, 1988, plaintiff's wound was draining serosanguineous fluid. On May 15, 1988, the surgical staples were removed, the wound opened, and the hematoma drained.

Plaintiff was transferred to defendant Moss Rehabilitation Center ("Moss") on May 17, 1989, where she met defendant, Raymond LaFontant, M.D. Dr. LaFontant ordered a culture from plaintiff's surgical wound on that same day which evidenced the presence of the bacteria, pseudomonas aeruginosa. Dr. LaFontant continued plaintiff on norfloxacin. Also while at Moss, Mrs. Poleri underwent physical and occupational therapy. She continued to experience problems with her back wound; it continued to discharge fluid and Dr. LaFontant had to continually pack the wound with gauze.

After approximately two weeks at Moss, Dr. LaFontant contacted Dr. Salkind's office because of plaintiff's ongoing pain. Dr. Salkind was out of the state so his partner, Dr. Bruno, went to see plaintiff at Moss on May 27, 1988.[2] He explained that Mrs. Poleri was to begin antibiotics (velosef) and that the gauze packing was to be removed from her back. Dr. Sewards examined plaintiff at Moss on June 8, 1988, at which time he recommended she be transferred back to a hospital.

------

[2] Dr. Bruno was never made a party to this suit. Therefore, any possible negligence as a result of his care could not be traced back to Dr. Salkind under an agency theory.

On June 9, 1988, plaintiff was transferred to Abington Hospital at which time she underwent x-rays which revealed osteitis, inflammation of the pelvic bone. She also underwent a surgical procedure to flush the wound performed by

Dr. Sewards. She underwent the same surgical procedure on June 11, 18, and 25, 1988.

By June 25, 1988, the infection had spread to Mrs. Poleri's pelvis where bone had been harvested. A culture revealed the presence of a methicillin resistant strain of staph aureus. On June 27, 1988, John J. Kelly, M.D., the Chairman of the Department of Medicine at Abington, took over plaintiff's care. Dr. Kelly began a program of the intravenous antibiotic vanomycin for the staph aureus and ceftazidime for the pseudomonas aeruginosa.

On July 21, 1988, Mrs. Poleri was transferred to Abington Rehabilitation Hospital ("Abington"), still under antibiotic treatment. She received physical and occupational therapy and underwent the care of the Chief of Plastic Surgery, Dr. Magdi Kodsi, who treated the infected wound by placing a gauze covered with acetic acid inside several times per day. Mrs. Poleri was discharged on August 10, 1988, and was to continue home care.

During the home care, plaintiff's wound dressings continued to be changed, as well as intravenous antibiotics. Thereafter, approximately six weeks after her discharge, plaintiff began to undergo physical therapy at Northwest Physical Therapy.

In January of 1989, Dr. Kodsi discovered a sinus tract within the healing tissue of Mrs. Poleri's back wound which required irrigation and surgery at Abington Hospital. Upon release plaintiff underwent seventeen days of home intravenous vancomycin treatment and was later given ciproflaxacin orally.

In May of 1990, Mrs. Poleri underwent plastic surgery to resurface the back wound. Finally, in 1991 and 1992, plaintiff's back had to be drained of pus because of recurring methicillin resistant staph aureus and again plaintiff was placed on intravenous antibiotics. Mrs. Poleri's osteomyelitis was in remission at the time of trial.

Plaintiffs filed suit on June 27, 1989, seeking recovery based on two theories of liability. First, that Drs. Salkind, Sewards, and LaFontant, all of whom were responsible for

Mrs. Poleri's care, reacted slowly to the infectious process and the delay resulted in additional trauma and treatment for Mrs. Poleri. Second, that had Mrs. Poleri timely been given the proper antibiotic therapy for her pseudomonas aeruginosa infection by the same responsible doctors, she would not have required the same extent of treatment at Abington and would not have developed the staph aureus infection or the osteomyelitis.

Appellants essentially contend that the trial court erred when it granted the motions of appellees for compulsory non-suits and frame their arguments as follows:

1. The trial court's sudden, unanticipated departure from the courtroom during the presentation of plaintiffs' case and its subsequent granting of defendants' motions for compulsory non-suit was a denial of due process and fundamental fairness constituting reversible error;

2. Considering all the evidence in the light most favorable to the plaintiffs, the evidence presented at trial established a *prima facie* case for negligence by the defendants sufficient to withstand defendants' motions for compulsory non-suit;

3. Plaintiffs' experts, an orthopedic surgeon and an infectious disease expert, were qualified to testify on the standard of care of the defendant doctors where the expert witnesses testified about the overlap between their respective specialities; and

4. The testimony of the plaintiffs' expert witnesses on the issues of causation and the defendants' duty of care was within the "fair scope" of their expert reports under Pa. R.Civ.P. 4003.5(c) where the defendants knew the subject matter of the proposed expert testimony and offered expert testimony to rebut plaintiffs' experts.

We first address the claims of appellants which contend that the trial court incorrectly granted the motions for compulsory non-suit made by the appellees.

Our standard of review of an order granting a compulsory non-suit is well-settled:

A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiffs' evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. *Hatbob v. Brown,* 394 Pa.Super. 234, 575 A.2d 607 (1990). When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury. *Id.* When this Court reviews the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered. *Eisenhauer v. Clock Tower [Towers] Associates,* 399 Pa.Super. 238, 582 A.2d 33 (1990).

*Taliferro v. Johns–Manville Corp.,* 421 Pa.Super. 204, 208–09, 617 A.2d 796, 799 (1992). A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff. *United National Ins. Co. v. J.H. France Refractories Co.,* 417 Pa.Super. 614, 619–21, 612 A.2d 1371, 1374 (1992), *rev'd. on other grounds,* 542 Pa. 432, 668 A.2d 120 (1995) (reversing on statute of limitations issue).

■ A cause of action for medical malpractice requires proof of four elements, namely, (1) that the medical practitioner owed a duty to the patient, (2) that the practitioner breached that duty, (3) that that breach was a proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) that the damages suffered by the patient were a direct result of the harm. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 62, 584 A.2d 888, 891 (1990); *Montgomery v. South Philadelphia Medical Group,* 441 Pa.Super. 146, 155–56, 656 A.2d 1385, 1390, *allo. denied,* 542 Pa. 648, 666 A.2d 1057 (1995). Instantly, the trial court entered a compulsory non-suit

(1) in favor of Dr. Sewards and Dr. Salkind based upon the conclusion of the court that appellants "failed to introduce

any evidence that [appellant] suffered any damages as a result of the negligence of [Dr. Sewards or Dr. Salkind]", and

(2) in favor of Dr. LaFontant based on its conclusion that appellants had failed to present evidence to establish that Dr. LaFontant had deviated from the applicable standard of care.

We are obliged to disagree with each ruling.

Appellants, in their case-in-chief, offered the expert testimony of Dr. Aragona, a board-certified orthopedic surgeon, to establish the damages suffered by appellant as a result of the allegedly negligent acts of Dr. Sewards and Dr. Salkind.[1] Dr. Aragona testified that the care rendered by both doctors was below the applicable standard of care and resulted in the following injuries:

A. Well, if you perform surgery, you look at your patient after surgery for a whole spectrum of possible complications: Changes in blood pressure, pneumonia, urinary tract infections, complications with the operation. And last but not least, the chance of infection. In this patient, Mrs. Poleri, her chance of infection went from probably less than two or three percent to a far higher number when her drainage didn't clear up. Had she had normal wound healing in the first place, she would have had the same chance of infection as anyone else who had the usual outcome of surgery, which is to heal your wound. But when her wound didn't heal, and she was transferred with soaked bandages, her chance of infection skyrocketed. And I am not exaggerating.

MS. DOUGHERTY [Counsel for Dr. Sewards]: I object. I move to strike.

THE COURT: I have to strike the word skyrocketing.

---

1. Since the trial court correctly admitted expert opinion testimony from Dr. Aragona and Dr. Pollack concerning the care rendered by Dr. Sewards and Dr. Salkind, it follows that the trial court found both experts to be "qualified". We need not, therefore, further address this portion of the third claim of error raised by appellants as it relates to Dr. Sewards and Dr. Salkind.

THE WITNESS: Increased dramatically.

\* \* \* \* \* \*

BY MR. FRANK:

Q. Doctor, do you have an opinion within a reasonable degree of medical certainty as to how Drs. Sewards and Salkind's conduct impacted upon Mrs. Poleri's health?

A. Yes, I do.

Q. And what is that opinion, sir?

A. It's my opinion that they reacted very slowly and late to the infective process which was developing. And had they intervened sooner, there would have been far less impact on the patient.

MR. FRANK: Thank you, Dr. Aragona. That's all the questions I have.

This testimony, standing alone, was, contrary to the conclusion of the court, sufficient to establish the causation element of a *prima facie* medical malpractice case.

 Our courts have recognized that in some instances the causal connection between the care provided by a physician and the resulting injury is not amenable to proof to a reasonable degree of medical certainty. In such cases, where the plaintiff seeks to establish that the defendant's negligence increased the *risk* of the harm which actually befell the plaintiff, a reduced standard of proof becomes applicable:

> Such cases by their very nature elude the degree of certainty one would prefer and upon which the law normally insists before a person may be held liable. Nevertheless, in order that an actor is not completely insulated because of uncertainties as to the consequences of his negligent conduct, Section 323(a) [of the Restatement (Second) of Torts] tacitly acknowledges this difficulty and permits the issue to go to the jury upon a less than normal threshold of proof.

[*Hamil v. Bashline*, 481 Pa. 256, 271, 392 A.2d 1280, 1287–88 (1978) ] (footnote omitted). Thus, where the testimony of the plaintiff's expert establishes that the defendant's failure

to diagnose and treat an existing condition has increased the risk of harm, the question of whether that conduct caused the plaintiff's ultimate injury requires a jury determination. *Jones v. Montefiore Hosp.*, 494 Pa. 410, 417 n. 8, 431 A.2d 920, 924 n. 8 (1981).

\* \* \* \* \* \*

In *Hamil v. Bashline, supra*, we noted that Section 323(a) of the Restatement (Second) of Torts (1965) has long been recognized as part of the law of Pennsylvania, and then held that the effect of that section was to relax the degree of certainty ordinarily required of a plaintiff's evidence to provide a basis upon which a jury may find causation:

> [O]nce a plaintiff has demonstrated that defendant's acts or omissions, in a situation to which Section 323(a) applies, have increased the risk of harm to another, such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact.
>
> 481 Pa. at 272, 392 A.2d at 1288 (emphasis supplied). Thus, medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm.

*Id.* at 416–417, 431 A.2d at 923–924 (footnote omitted).

*Montgomery v. South Philadelphia Medical Group, Inc., supra* at 156–58, 656 A.2d at 1390–91 (footnote omitted). Appellants, in the instant case, proceeding under the theory that the defendants' failure to provide a timely and adequate response to the onset of the infection, increased the risk of the injuries ultimately suffered by the plaintiff, bore the reduced burden of establishing: (1) that appellees had failed to exercise reasonable care, (2) that their failure increased the risk of physical harm to appellant, and (3) that that harm did, in fact, occur. *Mitzelfelt v. Kamrin, supra* at 66–69, 584 A.2d at 894–

95. Since appellants satisfied each of these elements, they were entitled to submit the issue of the liability of Dr. Sewards and Dr. Salkind to the jury, under instructions to determine whether the care provided by appellees was below the applicable standard of care and was the proximate cause of the injuries sustained by the appellants. We must, therefore, vacate the compulsory non-suit entered in favor of Dr. Sewards and Dr. Salkind and remand for trial.

Appellants also argue that the compulsory non-suit entered in favor of Dr. LaFontant must be vacated as it was the result of erroneous evidentiary rulings made by the trial court which precluded appellants from introducing evidence to establish the elements of a *prima facie* medical malpractice action against Dr. LaFontant. We agree.

Appellants offered the expert opinion testimony of Dr. Aragona that Dr. LaFontant was responsible, as well as Dr. Sewards and Dr. Salkind, for the post-operative wound care provided to appellant and that Dr. LaFontant's care of appellant breached the applicable standard of care. The trial court, however, in response to the motions of appellees, struck all expert testimony by Dr. Aragona on the standard of care applicable to Dr. LaFontant as a result of its conclusion that Dr. Aragona's testimony was beyond the scope of the expert reports he had produced prior to trial.[2]

**2.** Appellants, in their third claim of error, include the argument that the trial court erred when it precluded Dr. Aragona, a board-certified orthopedic surgeon, from testifying that it was his expert opinion that Dr. LaFontant, a physiatrist, deviated from the appropriate standard of care. The trial court ruled this testimony inadmissible based upon its conclusion that Dr. Aragona, in contrast to his qualification to offer opinion testimony regarding Dr. Sewards and Dr. Salkind, was not qualified to render an opinion regarding the applicable standard of care of a physiatrist. To the extent that this was the basis for precluding the proffered testimony of Dr. Aragona, we are constrained to agree with appellants. Dr. Aragona, during *voir dire*, testified that wound care is an area in which the specialties of Dr. Aragona and Dr. LaFontant would overlap. This overlap is sufficient to qualify Dr. Aragona to offer his opinion regarding the wound care treatment provided by Dr. LaFontant. *See: Estate of Pew*, 409 Pa.Super. 417, 598 A.2d 65 (1991), *allo. denied*, 530 Pa. 645, 607 A.2d 255 (1992) ("Experts in one area of medicine may be found to be qualified to address other areas of specialization where the specialties overlap in practice...").

 Our review of the record compels the conclusion that the evidentiary ruling of the trial court which precluded the testimony was based on an overly narrow reading of the expert reports submitted by Dr. Aragona.

"Experts may testify at trial concerning matters which are within the fair scope of a pretrial report." *Pascale v. Hechinger Company of Pennsylvania*, 426 Pa.Super. 426, 435, 627 A.2d 750, 754 (1993) (citations omitted). "The avoidance of unfair surprise to an adversary concerning the facts and substance of an expert's proposed testimony is the primary purpose of the rule requiring that testimony be within the fair scope of the pretrial report." *Id.* (citation omitted).

In *Wilkes–Barre Iron & Wire Works, Inc. v. Pargas of Wilkes–Barre, Inc.*, 348 Pa.Super. 285, 502 A.2d 210 (1985), the Superior Court noted that

it is impossible to formulate a hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his or her pretrial report. Rather, the determination must be made with reference to the particular facts and circumstances of each case. The controlling principle which must guide is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to disclose, at his adversary's request, "the substance of the facts and opinions to which the expert is expected to testify" is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony. *See Augustine v. Delgado*, 332 Pa.Super. [194] at 199, 481 A.2d [319] at 321 [ (1984) ] ("Pa.R.Civ.P. 4003.5 favors liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise"); *Martin v. Johns–Manville Corp.*, 322 Pa.Super. [348] at 358, 469 A.2d [655] at 659 [ (1983) ] ("[w]e have found experts' reports to be adequate ... when the report provides *sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness.*")

In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent

is on the word "fair." The question to be answered is whether, under the particular facts and circumstances of the case, *the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.*

*Id.,* 348 Pa.Super. at 290, 502 A.2d at 212–213.

Thus, in determining whether an expert's trial testimony falls within the fair scope of his pre-trial report, the trial court must determine whether the report "provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness." *Hickman v. Fruehauf Corporation,* 386 Pa.Super. 455, 459, 563 A.2d 155, 157 (1988) [ (1989) ], *appeal denied,* 528 Pa. 611, 596 A.2d 158 (1991) (citation omitted). The trial court must also inquire "whether there has been surprise or prejudice to the party which is opposing the proffered testimony of the expert, based upon any alleged deviation between the matters disclosed during discovery, and the testimony of such expert at trial." *Trent v. Trotman,* 352 Pa.Super. 490, 502, 508 A.2d 580, 587 (1986). "What constitutes surprise and prejudice, however, depends upon the pre-trial particulars of each case." *Augustine by Augustine v. Delgado,* 332 Pa.Super. 194, 199, 481 A.2d 319, 321 (1984).

*Walsh v. Kubiak,* 443 Pa.Super. 284, 291–92, 661 A.2d 416, 420–21 (1995), *allo. denied,* 543 Pa. 716, 672 A.2d 309 (1996) (emphasis supplied). *Accord: Pascale v. Hechinger Co. of Pennsylvania,* 426 Pa.Super. 426, 435, 627 A.2d 750, 754 (1993); *Greer v. Bryant,* 423 Pa.Super. 608, 614–16, 621 A.2d 999, 1003 (1993).

Appellants supplied two expert reports authored by Dr. Aragona to appellees during discovery. The first report, dated December 10, 1991, included an extensive summary of the treatment provided to appellant, beginning with the initial diagnosis of her back condition and continuing through her eventual treatment at Abington Memorial Hospital. This first

174

report contained the following opinion with regard to the adequacy of the post-operative wound care:

As I stated in my letter of December 10, 1991 [sic] it is my professional opinion that the medical personnel attending Barbara Poleri were negligent in the care of her postoperative wound drainage and subsequent infection. This negligence led directly to additional treatment and disability for the patient. *My comments are limited to the care of her operating surgeons.* It is my opinion that allowing the patient to be discharged to Moss Rehabilitation Facility with an open wound was the origin of the negligence. The operating surgeon is responsible for the postoperative care of the patient's incision. A drainage wound over the site of spinal surgery is ominous. The area of spinal surgery and bone graft can easily develop a deep hematoma which can be colonized and converted to an abscess.

*Consistent* [sic] *drainage from an operative wound is consistent* with the development of deep unresolved hematoma. Additionally, there is no notation on the part of the surgeons regarding wound care for the Moss Rehabilitation Center. The Nurses Notes clearly indicate that the wound was draining at the time of discharge. The issue should have been taken up directly with the physicians at Moss Rehabilitation. Certainly as the wound situation progressed and worsened at Moss Rehabilitation aggressive wound care should have been ordered. The patient verbalized that the constant back pain as well as a new feeling of pain not present prior to or directly after the surgery. In my opinion there were ample opportunities to investigate this problem and proceed with appropriate care, significantly prior to Dr. Sewards' visit of June 8, 1988.

The precise use of antibiotics in the postoperative wound is a field to be commented on by a physician trained in infectious disease. However, wound care and obtaining such a consultation at the appropriate time is the responsibility of the operating surgeon.

(emphasis supplied).

Presumably in response to the fact that the December 10, 1991, report was limited to opinions regarding the treatment

rendered by Dr. Sewards and Dr. Salkind, Dr. Aragona also submitted a second pre-trial report, dated May 3, 1994, which consisted entirely of the following:

It is my professional opinion that the physicians at Moss Rehabilitation were negligent in the care of Ms. Poleri.

Adequate wound care was not provided by the Moss Rehabilitation medical staff in conjunction with her surgeon.

The trial court precluded Dr. Aragona from testifying at trial concerning the adequacy of the care provided by Dr. LaFontant as outside the scope of his expert reports, ruling that:

Not only is this second report wholly inconsistent with the opinions expressed in Aragona's first report, which was specifically limited to the conduct of the operating physicians, it is devoid of all support. It does not explain what issues about which the witness intends to testify. It does not explain why the witness feels that the physicians at Moss were negligent. Nor does it say which physicians at Moss in the witness' opinion were allegedly negligent. This Court fails to see how this second report, simply referring to the "physicians at Moss Rehabilitation," affords Dr. LaFontant the opportunity to formulate an adequate response to the testimony.

Appellants persuasively argue that the two reports, read in conjunction, were sufficient to inform Dr. LaFontant that appellants would attempt to establish that Dr. LaFontant, who was also responsible for post-operative wound care, breached the standard of care applicable to his care of appellant and the treatment of the surgical wound.

However, even were we to concur in the assessment of the trial court that the reports provided by Dr. Aragona contained insufficient facts to establish the duty of care owed to appellant by Dr. LaFontant, Dr. LaFontant admitted, in his deposition testimony which appellant read into the record, that he was responsible for the care of appellant's wound while she was a patient at Moss:

MR. FRANK [Counsel for Appellants]: Did Mrs. Poleri have any kind of agreement or contract with you or were you just simply assigned when she was sent to the hospital?

Answer: She was assigned to my service, I took care of her.

\* \* \* \* \* \*

Question: What were your goals?

Trying to accomplish with her according to her strength. We wanted at first to increase her strength and then to work on her transferability and then ambulation. And for her, she had bowel and bladder problem not controlled. Our goal was to train the bladder and the bowel. And then she came, as you know, with an open wound and *we wanted to treat that open wound. With the help of the orthopedic surgeon and the neurosurgeon.*

Question: Aside from these rehabilitative-type goals that you were attempting to reach—that is the transferability, daily living, strengthening and that sort of thing, you also took under your care these other conditions that she had when she was transferred.

Answer: Yes. But I was not the primary physician for those problems. The open wound is from the surgery, that's why right away they contacted the surgeon and the surgeon kindly accepted to forward that aspect of her care.

Question: Who was in charge of her at Moss?

Answer: I was in charge.

\* \* \* \* \* \*

Question: *As far as at Moss, you were in charge of wound care with the supervision of her orthopedic surgeon and the neurosurgeon, who would come if you called them.*

Answer: That's right, and they would respond by phone.

Question: *If you didn't contact them to tell them what was happening they would not.*

Answer: No, they would not.

(emphasis supplied).

This Court, in *Greer v. Bryant,* 423 Pa.Super. 608, 621 A.2d 999 (1993), affirmed a verdict entered in favor of the plaintiff,

the mother of a deceased newborn infant, who instituted a medical malpractice action against the doctor and hospital that had provided her pre-natal care. The plaintiff-mother sought to establish that the doctor had committed malpractice in failing to admit her to the hospital when she first exhibited signs of fetal distress, a theory supported by the expert report produced by the plaintiff during discovery. The expert, at trial, however, testified that the interns who had examined the plaintiff-mother and who had observed the indicia of fetal distress were under a duty to contact a hospital administrator to have plaintiff admitted—even if such a step required disregarding the opinion of their immediate supervisor, who was the plaintiff's treating physician. The hospital argued that the opinion testimony concerning the conduct of the interns should not have been admitted since it reflected a "new theory" which was not included in the pre-trial report of the expert, which addressed only the failure of the treating physician to admit the plaintiff-mother. This Court disagreed, observing that:

[The expert's] report clearly states that, in her opinion, the hospital employees should not have sent [plaintiff-mother] home after observing her condition on September 20. Her report does not contain any qualification of this opinion, but is couched in rather absolute language. Questions regarding whether the interns should have sent [plaintiff-mother] home even if [the doctor] asked the interns to do so are a fair corollary to her opinion. Indeed, it seems that upon reading the report, the natural response to [the expert's] assertion would be "was the hospital acting inappropriately *even if* [the doctor] wanted [plaintiff-mother] to be sent home?" Put another way, the essential question in this case is whether [the hospital] was negligent in sending [plaintiff-mother] home. The expert's report opines that [the hospital's] conduct in doing so was below the standard of care. It is only natural to seek a qualification of that statement. Therefore, the qualification of the statement is within the report's "fair" scope. [The hospital's] decision to send [plaintiff-mother] home was contemplated by the report and

counsel should have anticipated that the "failure to override theory" was looming.

*Greer v. Bryant, supra* at 616–17, 621 A.2d at 1004.

■ Instantly, the first report by Dr. Aragona clearly expressed his opinion that the post-operative wound care provided to appellant by her surgeons was inadequate and that her condition continued to worsen while appellant was a patient at Moss. This assertion, coupled with the admission of Dr. LaFontant that he was in charge of the day-to-day care of the wound while appellant was being treated at Moss should have clearly indicated to appellees that the issues of (1) whether Dr. LaFontant owed a duty to appellant to take affirmative steps to advise Dr. Sewards and Dr. Salkind of the situation or to treat the wound, (2) whether Dr. LaFontant was obligated to *independently* determine an appropriate course of action, and (3) whether the responses to the deteriorating situation taken by Dr. LaFontant were appropriate, were issues which would be explored at trial. Opinion testimony on these issues was a fair corollary of the conclusions contained in the expert reports furnished by Dr. Aragona and could not have caused any unfair surprise to appellees.[3] The "fair scope" of the report of Dr. Aragona permits the reasonable explanation of conclusions contained therein or even expansion upon those opinions. *Christiansen v. Silfies,* 446 Pa.Super. 464, 476–78, 667 A.2d 396, 402 (1995), *citing Wilkes–Barre Iron and Wire Works, Inc. v. Pargas of Wilkes–Barre, Inc.,* 348 Pa.Super. 285, 502 A.2d 210 (1985). Accordingly, the trial court should have permitted Dr. Aragona to testify regarding the standard of care owed to appellant by Dr. LaFontant. The exclusion of this testimony under the circumstances of this case constituted reversible error requiring that the non-suit entered in favor of Dr. LaFontant be vacated.

3. Our conclusion that Dr. LaFontant would not have been unfairly surprised is substantially buttressed by the fact that Dr. Dennis Bonner, an expert witness retained by Dr. LaFontant, completed a written report on September 26, 1994, and testified at trial to the effect that Dr. LaFontant's treatment of the wound was not a deviation from the appropriate standard of care.

Since appellants (1) successfully presented evidence upon which a jury could find Dr. Sewards and Dr. Salkind liable, and (2) were improperly prevented from presenting evidence to establish a *prima facie* case of medical malpractice against Dr. LaFontant, we are constrained to reverse the compulsory non-suits entered in favor of appellees and remand for a new trial.[4]

Judgments vacated. Case remanded for new trial. Jurisdiction relinquished.

---

**4.** Our decision vacating the entry of compulsory non-suits in favor of appellees renders moot the claim of appellants that the trial court committed reversible error in leaving the bench during the presentation to the jury of videotape deposition testimony. We note, however, that the record does not suggest that appellants suffered any prejudice as a result of the absence of the trial court judge and, thus, would not have been entitled to any relief.