# Callari v. Rosenwasser

*Fredric L. Goldfein* and *Samantha L. Conway,* for appellant.

*Martin Goch,* for appellee.

TERESHKO, *J.,* August 7, 2003—Before the court is an appeal taken by defendant-appellant Dr. Robert H. Rosenwasser from an order of the court dated February 5, 2003, which denied Dr. Rosenwasser's motion for post-trial relief.

The facts and procedural history are as follows:

On October 9, 1996, Mr. Angelo Callari underwent brain surgery at Will's Eye Hospital in Philadelphia, Pennsylvania to cure a brain aneurysm. Dr. Rosenwasser, a neurosurgeon, performed the surgery and also acted as attending physician responsible for Mr. Callari's postoperative care. (Notes of testimony, 11/4/02 at 154.) After surgery, Mr. Callari developed a fever and increased white blood cell count, prompting Dr. Rosenwasser and his medical consultants to order blood cultures in order to find an infection. (N.T. at 60.) Two blood cultures were taken on October 11, 1996, the first from Mr. Callari's right arm and the second from the arterial line. (N.T. at

61-63.) Because of his persistent fever and increased white blood cell count, Mr. Callari was given three antibiotics—Vancomycin, Fortaz, and Gentamicin—on October 12, 1996. Mr. Callari received these antibiotics until October 15, 1996, when his white blood cell count and his fever began to return to normal. (N.T. at 82.) Dr. Rosenwasser testified that on October 15 some of the catheter lines were removed, which Dr. Rosenwasser believed precipitated the return to normal in both Mr. Callari's temperature and his white blood cell count. (N.T. at 123.) As a result, Dr. Rosenwasser and his medical consultants concluded that Mr. Callari had a line sepsis caused by an infected catheter.

A third culture was taken on October 16, 1996, from the Swan-Ganz catheter tip. (N.T. at 64.) The results from the first two cultures came back negative on October 17, 1996. (N.T. at 61.) A fourth and a fifth blood culture were taken on October 18, 1996, one from the subclavian catheter and the other taken from the patient's blood, *i.e.* peripherally.[1] (N.T. at 64-65.) Also on the 18th, after noticing another increase in Mr. Callari's temperature and white blood cell count, Dr. Rosenwasser placed Mr. Callari back on Vancomycin, Fortaz, and Gentamicin. (N.T. at 134.) A sixth blood culture was taken on October 19, 1996, from the CVP catheter tip. (N.T. at 65.) On October 20, 1996, the results of the third culture came

---

1. Dr. Rosenwasser testified that "peripheral" meant that this particular blood culture was taken directly from Mr. Callari's blood and not from an instrument. Therefore, it indicated to Dr. Rosenwasser and his medical consultants that Mr. Callari's full blood was turning up positive for enterococcus faecalis. (N.T. at 69-70.)

back positive for the bacteria enterococcus faecalis.[2] (N.T. at 88.) The results from the fourth and fifth blood cultures came back positive for enterococcus faecalis on October 21, 1996. (See Microbiology final report, P-1 E.) On October 22, 1996, Dr. Rosenwasser removed another intravenous catheter line. (N.T. at 126.) On the same day, Mr. Callari's temperature and his white blood cell count began to return to normal. As a result, Dr. Rosenwasser took Mr. Callari off antibiotics. Although the sixth blood culture also came back positive for enterococcus faecalis on October 23, 1996, Dr. Rosenwasser testified that the results stated "isolated from enrichment broth only," indicating a very low number of bacteria on the catheter tip. (N.T. at 70-71.) On October 29, 1996, Mr. Callari was released from the hospital.

During the next four months, Mr. Callari complained of fatigue and dizziness. He also experienced headaches, lost a significant amount of weight, and continuously gave off a foul odor. (N.T. 11/6/02 at 34-39.) He visited several doctors during this time, including Dr. Rosenwasser. (N.T. at 34-36.) On March 4, 1997, Mr. Callari was hospitalized for acute renal failure at the Pocono Medical Hospital in East Stroudsburg, Pennsylvania. Tests conducted there revealed the existence of enterococcus faecalis. (N.T. 11/4/02 at 178.) Tests also showed that Mr. Callari had vegetation on the surface of the aortic valve necessitating open heart surgery. (N.T. at 179.) Mr. Callari was transferred to St. Luke's Hospital in

---

2. Enterococcus faecalis is a "widespread species that is a normal inhabitant of the human intestinal tract; it causes urinary tract infections, infective endocarditis, and bacteremia that is often fatal." Dorland's Illustrated Medical Dictionary 559 (28th ed. 1994).

Bethlehem, Pennsylvania, where he had emergency heart surgery to replace the aortic valve. (N.T. at 179.) Mr. Callari continued to have a fever. Tests revealed he had infections in various places in his body. After undergoing several more surgical procedures, Mr. Callari passed away from enterococcus faecalis endocarditis on April 6, 1997, at St. Luke's Hospital.

On March 5, 1999, plaintiff/appellee Mrs. Debra Callari as administratrix of Mr. Angelo Callari's estate filed this action against Dr. Rosenwasser with a praecipe to issue writ of summons. On June 1, 1999, Mrs. Callari filed her complaint. On September 16, 1999 she filed a 16-count amended complaint. She alleged, inter alia, that Dr. Rosenwasser improperly diagnosed and treated Mr. Callari's infection and also improperly administered antibiotics during Mr. Callari's stay at Will's Eye Hospital. (Compl. ¶37.) Mrs. Callari alleged that Dr. Rosenwasser's negligence caused Mr. Callari's death months later on April 6, 1997. (Compl. ¶34.)

On October 17, 2002, Dr. Rosenwasser filed a motion in limine asking that Mrs. Callari's expert witness, Dr. Joseph Cervia, be precluded from testifying. Because Dr. Cervia is board certified in infectious disease and Dr. Rosenwasser is board certified in neurosurgery, Dr. Rosenwasser argues that Dr. Cervia was precluded from testifying under 40 P.S. §1303.512 of the Medical Care Availability and Reduction of Error Act (MCare Act), which became effective on May 20, 2002. (Def.'s mot. limine prec. pl.'s expert ¶13.) On November 4, 2002, this court denied Dr. Rosenwasser's motion in limine to preclude Dr. Cervia's testimony. In consideration of the MCare Act, this court determined that although Dr. Cervia

is not a neurosurgeon, his testimony was directed to the standard of care and causation relating to Dr. Rosenwasser's postoperative treatment of an infectious disease, and therefore such testimony from an infectious disease expert properly fit within the exceptions enumerated in the MCare Act. (N.T. 11/4/02 at 160-61.)

The trial commenced on November 4, 2002. At trial, Dr. Cervia testified that Dr. Rosenwasser's treatment of Mr. Callari's postoperative enterococcus faecalis infection breached the standard of care related to treatment of such an infection. (N.T. at 193.) Specifically, Dr. Cervia testified that Dr. Rosenwasser should have kept Mr. Callari on the antibiotics Vancomycin and Gentamicin continuously for 14 days. (N.T. at 196-97.) Instead, Mr. Callari received two discontinuous antibiotic treatments, each individual treatment lasting roughly three and a half days. Dr. Cervia also testified that Fortaz was not an effective antibiotic for treating an enterococcus faecalis infection. (N.T. at 189.) Furthermore, Dr. Cervia opined that Dr. Rosenwasser should have consulted an infectious disease specialist. (N.T. at 198.) Finally, Dr. Cervia stated that Dr. Rosenwasser placed too much reliance on Mr. Callari's white blood cell count and fever without allocating more importance to the blood culture results. (N.T. at 194-95.) As a result, Dr. Cervia testified, Mr. Callari was discharged prematurely. (N.T. at 199.) Dr. Cervia testified that Dr. Rosenwasser's failure to properly treat Mr. Callari's infection placed Mr. Callari at great risk of harm and acted as a substantial factor in causing the endocarditis condition that ultimately killed Mr. Callari. (N.T. at 201-202.) However, Dr. Cervia did admit that he could not be certain whether Dr. Rosen-

wasser's treatment failed to eradicate Mr. Callari's infection. (N.T. at 200-201.)

On November 6, 2002, at the close of Mrs. Callari's case in chief, Dr. Rosenwasser moved for compulsory nonsuit. Dr. Rosenwasser renewed his argument that Dr. Cervia should be precluded from testifying pursuant to the MCare Act. Dr. Rosenwasser also maintained that Dr. Cervia failed to testify to a reasonable degree of medical certainty that the particular enterococcus faecalis infection he treated in October 1996 caused the enterococcus faecalis endocarditis that killed Mr. Callari. (N.T. 11/6/02 at 57.) This court, in considering the evidence most favorable to the non-moving party, denied Dr. Rosenwasser's motion for compulsory nonsuit. (N.T. at 63.) On November 7, 2002, the trial ended with a unanimous jury verdict in favor of Mrs. Callari, awarding $900,000 in damages. (N.T. 11/7/02 at 156.) On November 14, 2002, Dr. Rosenwasser timely filed his motion for post-trial relief asserting that this court erred in denying his motion in limine to preclude Dr. Cervia's testimony and also in denying his motion for compulsory nonsuit. On February 5, 2003, upon consideration of Dr. Rosenwasser's motion for post-trial relief and Mrs. Callari's response thereto, this court denied Dr. Rosenwasser's motion.

Appellant raises the following claims in his statement of matters complained of upon appeal pursuant to Pa.R.A.P. 1925(b):

"(1) The trial court erred in denying Dr. Rosenwasser's motion in limine to preclude Dr. Cervia's testimony pursuant to section 1303.512 of the MCare Act because Dr. Cervia and Dr. Rosenwasser do not share board certifi-

cation in the same subspecialty. (2) Trial court erred in overruling Dr. Rosenwasser's objection to Dr. Cervia's testimony on the grounds he was precluded under the MCare Act. (3) Dr. Cervia was not qualified under Pennsylvania common law to testify against Dr. Rosenwasser. (4) Trial court erred in denying Dr. Rosenwasser's motion for compulsory nonsuit and in failing to grant defendant a directed verdict based on the grounds that Dr. Cervia was not qualified to testify as an expert witness against Dr. Rosenwasser because the two doctors do not share board certification in the same subspecialty. (5) Trial court erred in denying Dr. Rosenwasser's motion for compulsory nonsuit based on the grounds that Dr. Cervia failed to testify to a reasonable degree of medical certainty that Dr. Rosenwasser's actions or inactions caused the decedent's death. (6) Dr. Cervia failed to testify to a reasonable degree of medical certainty that the infection that the decedent had in October 1996 caused his death in April 1997. (7) Trial court erred in ruling on Dr. Rosenwasser's motion for post-trial relief without scheduling oral argument and without giving the parties opportunity to brief the issues raised in the motions."

## LEGAL ARGUMENT

Defendant Dr. Rosenwasser, a neurosurgeon, maintains that section 1303.512 of the MCare Act precludes Dr. Cervia from testifying as a medical expert against him because Dr. Cervia is not board certified by the same or similar approved board as Dr. Rosenwasser. He further contends that Dr. Cervia is also precluded from testifying as a medical expert in this case under Pennsylvania common law. However, because the issue in this case

deals with the allegedly negligent diagnosis and treatment of an infection, Dr. Cervia's expertise in infectious diseases qualifies him as a medical expert in this case under both the MCare Act and under Pennsylvania common law.

Before discussing the issue regarding Dr. Cervia's qualification pursuant to the MCare Act, this court will address Mrs. Callari's assertion that the MCare Act does not apply to the instant matter. Because Mrs. Callari initiated this action on March 5, 1999, and the MCare Act did not become effective until May 20, 2002, Mrs. Callari argues that applying this Act to the instant matter would impermissibly give it retroactive effect. It is true that absent clear legislative intent to the contrary, statutes are to be construed to operate prospectively only. *Gehris v. PennDOT,* 471 Pa. 210, 214-15, 369 A.2d 1271, 1273 (1977) (citing Statutory of Construction Act of 1972, 1 Pa.C.S. §1926). However, a statute will not operate retrospectively "merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment." *Id.* at 215, 369 A.2d at 1273. Rather, "an Act is not retroactively construed when applied to a condition existing on its effective date even though the condition results from events which occurred prior to that date." *Creighan v. Pittsburgh,* 389 Pa. 569, 575, 132 A.2d 867, 871 (1957).

Although Mrs. Callari retained Dr. Cervia prior to the MCare Act becoming effective, Dr. Cervia did not testify until November 4, 2002. Because the MCare Act sets the standards a witness must meet in order to provide expert medical testimony, and such testimony in this case was not given until more than five months after the

MCare Act became effective, applying the act to the instant matter would not be retroactive, but rather prospective. Therefore, the MCare Act applies to this case.

Resuming our analyses, Dr. Cervia qualifies as a medical expert in this case under the MCare Act. Section 1303.512 of the MCare Act codifies the standards that a witness must meet in order to offer expert medical testimony against a physician in a medical professional liability action. Section 1303.512 of the MCare Act, in relevant part, states:

"(c) Standard of care— . . . an expert testifying as to a physician's standard of care also must meet the following qualifications:

"(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

"(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

"(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

"(d) Care outside specialty—A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

"(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

"(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

"(e) Otherwise adequate training, experience and knowledge—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period."

Dr. Cervia falls under section 1303.512(c)(1) inasmuch as the care complained of deals with the care for an infection. When commenting on how the MCare Act applied to this situation, this court made the following observation:

"Court: . . . The area under scrutiny here is infectious disease and the treatment of infectious disease, not the specialty or subspecialty of surgical care, so that I thought that though he's [Dr. Cervia] not a surgeon, the issue here is whether or not the infection was treated properly and thus the proper expert opinion would have been in the area of infectious disease, and I believe that does fit into an exception to the act at this point." (N.T. 11/4/02 at 162.)

Mrs. Callari's complaint alleges that Dr. Rosenwasser negligently diagnosed Mr. Callari's infection, failed to treat it properly with antibiotics, failed to consult an infectious disease specialist, and failed to perform other tasks necessary to properly treat Mr. Callari's infection. (Compl. ¶37.) Mrs. Callari did not assert that Dr.

Rosenwasser was negligent in performing surgery on Mr. Callari. Furthermore, while not opining on the quality of surgery performed by Dr. Rosenwasser, Dr. Cervia did opine that Dr. Rosenwasser breached the standard of care relating to the treatment and diagnosis of an infectious disease. (N.T. at 193-200.) Clearly, the specific standard of care at issue in this case deals with the proper diagnosis and treatment of an infectious disease, and that was the only standard upon which Dr. Cervia opined.

Dr. Rosenwasser argues that because he, as a neurosurgeon, was treating Mr. Callari post-surgically for a brain aneurysm, Dr. Cervia cannot opine on his treatment of Mr. Callari's infection. However, Dr. Rosenwasser's own testimony undermines such an argument. Dr. Rosenwasser admitted that he was the attending physician in charge of the postoperative treatment of Mr. Callari's infection. (N.T. at 49.) Yet he testified during cross-examination that issues relating to his treatment of Mr. Callari's infection were out of his area of expertise as a neurosurgeon.

"Q: And what was the type of organism that was involved [with Mr. Callari's infection in October 1996]?

"A: Well, again, it's out of my area because I'm a neurosurgeon. . . . (N.T. 11/4/02 at 51.) . . .

"Q: Sir, you had mentioned in [your] deposition . . . one of the reasons that you discontinued the antibiotics for this infection was that you were concerned about a super infection?

"A: Well, again, I'll have to clarify what that is. . . . So the—again I'm speaking of—it's a little bit out of my area because I'm a neurosurgeon . . . ." (N.T. at 83-84.)

Clearly, based on Dr. Rosenwasser's own testimony, the specific care at issue in this case does not fall within the exclusive expertise of a neurosurgeon. Instead, the care complained of deals with the diagnosis and treatment of an infection, and an infectious disease expert would be substantially familiar with such a standard of care.

Dr. Cervia, an infectious disease expert, has substantial familiarity with the applicable standard of care relating to the treatment and diagnosis of an enteroccocus faecalis infection, including treatment of that infection given by a neurosurgeon postoperatively. According to the curriculum vitae Dr. Cervia submitted to the court, he was board certified in infectious diseases since 1990, and remained so during the time Dr. Rosenwasser treated Mr. Callari's postoperative infection of enterococcus faecalis in October 1996. Dr. Cervia testified that about 90 percent of his practice deals with treating adults suffering from an infectious disease. (N.T at 154.) Dr. Cervia's teaching position deals mainly with adult infectious diseases, some of his research involves adult infectious diseases, and in 1998 he renewed his board certification in adult infectious disease, which will remain valid through 2010. (N.T. at 154-55.) Dr. Cervia also testified that he gives approximately 100-120 infectious disease consultations per month at Long Island Jewish Medical Center for attending physicians, including neurosurgeons. (N.T. at 164-65.) Some of these consultations also deal with patients diagnosed with enterococcus faecalis. (N.T. at 165.) Because the standard of care at issue in this case involves the postoperative care given by a neurosurgeon treating an enterococcus faecalis

infection, Dr. Cervia's practice in adult infectious diseases, which, as this court noted above, includes assisting neurosurgeons in situations similar to the instant matter, qualifies him as an expert pursuant to section 1303.512(c)(1). The fact that Dr. Rosenwasser was also the surgeon does not limit his responsibility to the surgical care, especially since he assumed responsibility as the attending physician for Mr. Callari's post-surgical care. (N.T. at 76.)

The circumstances in this case also satisfy the conditions set forth in section 1303.512(d). Pursuant to section 1303.512(d), a court may waive the same subspecialty requirement enumerated in section 1303.512(c)(2) for an expert testifying on the standard of care or treatment of a condition if the court determines that:

"(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

"(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence." Section 1303.512(d)(1)(2).

As noted above, Dr. Cervia is board certified in infectious diseases. He also has experience diagnosing and treating enterococcus faecalis infections. Therefore, this court found that Dr. Cervia's training in the diagnosis and treatment of infectious diseases, including enterococcus faecalis infections, satisfied section 1303.512(d)(1).

Moreover, this court found Dr. Rosenwasser provided Mr. Callari with care that was not within his specialty and competence, pursuant to section 1303.512(d)(2). Again, Dr. Rosenwasser's aforementioned testimony acts as persuasive. When addressing issues pertaining to his

diagnosis and treatment of Mr. Callari's infection, Dr. Rosenwasser repeatedly admitted that such issues were "out of my area . . . because it's not neurosurgery. . . ." (N.T. at 119.) Nevertheless, while acting as the attending physician responsible for Mr. Callari's post-surgical care, Dr. Rosenwasser diagnosed and treated Mr. Callari's infection. He did so without the aid of an infectious disease expert, even though it was within his power as the attending physician to request such assistance. (N.T. at 81.) Clearly, as evinced by his own testimony, Dr. Rosenwasser's diagnosis and treatment of Mr. Callari's infection was not within his specialty or competence. Therefore, this court found such care satisfied section 1303.512(d)(2).

Moreover, even if the MCare Act does not apply to the instant matter, Dr. Cervia easily qualifies as a competent medical expert under the more liberal Pennsylvania common law. As the Pennsylvania Supreme Court set forth in *Miller v. Brass Rail Tavern Inc.,* 541 Pa. 474, 664 A.2d 525 (1995), the common-law test to be applied when qualifying an expert witness is "whether the witness has *any* reasonable pretension to specialized knowledge on the subject under investigation." *Miller,* 541 Pa. at 480-81, 664 A.2d at 528. (emphasis in original) Dr. Cervia, as a doctor board certified in infectious diseases, clearly has a reasonable pretension to specialized knowledge regarding the treatment and diagnosis of an infectious disease. Therefore, he easily satisfies the Pennsylvania common-law standard for qualifying a witness as a competent expert.

In *Poleri v. Salkind,* 453 Pa. Super. 159, 683 A.2d 649 (1996), the Superior Court had before it a case where the

facts bear close resemblance to the instant matter. There, the plaintiff claimed that the defendants, including a neurosurgeon who was treating her after performing surgery on her back, negligently treated an infection she contracted after surgery. Specifically, she complained that the defendant doctors reacted slowly to her infectious condition and that she had been given the wrong antibiotic therapy. *Id.* at 164-66, 683 A.2d at 652. The Superior Court affirmed the trial court's decision to allow an infectious disease expert to testify against the neurosurgeon regarding the standard of care used to treat the plaintiff's infection.[3] *Id.* at 168 n.1, 683 A.2d at 654 n.1.

As in *Poleri,* Mr. Callari suffered an infection following surgery performed by a neurosurgeon, and similar to the facts in *Poleri* the neurosurgeon treated that infection. Also similar to *Poleri,* Dr. Cervia, as an infectious disease expert, was allowed to opine on the treatment of a postoperative infection given by a neurosurgeon.

Dr. Rosenwasser's next argument suggests that Dr. Cervia failed to testify to a reasonable degree of medical certainty that Dr. Rosenwasser's treatment of Mr. Callari's infection in October 1996 caused Mr. Callari's death in April 1997. Specifically, Dr. Rosenwasser argues that because Dr. Cervia admitted he was not certain whether Dr. Rosenwasser's negligent treatment failed to eradicate Mr. Callari's infection in October 1996, such testimony fails to establish the necessary causal link be-

3. In *Poleri,* the Superior Court ratified the trial court's decision to allow an infectious disease expert to opine on the care given by the neurosurgeon because of the apparent overlap that existed between the specialties when treating an infectious disease. *Id.* at 166, 683 A.2d at 653.

tween the infection that existed in October to the infection that killed Mr. Callari in April 1997. (N.T. 11/6/02 at 58.) However, Pennsylvania law only requires that the expert witness testify to a reasonable degree of medical certainty that the defendant's negligence increased the risk of harm to the plaintiff, and Dr. Cervia's testimony, as will be discussed in detail below, satisfies such a standard.

In *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990), the Supreme Court gave the applicable standard:

"Once there is sufficient testimony to establish that (1) the physician failed to exercise reasonable care, that (2) such failure increased the risk of physical harm to the plaintiff, and (3) such harm did in fact occur, then it is a question properly left to the jury to decide whether the acts or omissions were the proximate cause of the injury." *Mitzelfelt,* 526 Pa. at 68, 584 A.2d at 894-95.

In rendering its opinion, the *Mitzelfelt* court noted that it was the jury's role, not the medical expert's role, to balance probabilities and determine whether the defendant's negligence acted as a substantial factor in bringing about the harm. *Id.,* 526 Pa. at 68, 584 A.2d at 895.

In satisfaction of *Mitzelfelt,* Dr. Cervia provided sufficient testimony to establish that Dr. Rosenwasser failed to exercise reasonable care in the treatment of Mr. Callari's infection. Dr. Cervia testified, inter alia, that Dr. Rosenwasser should have kept Mr. Callari on antibiotics for 14 consecutive days, that he should have consulted an infectious disease specialist, and that he should have relied more heavily on the blood culture results. (N.T. 11/4/02 at 193-96.) Such testimony was made with

a reasonable degree of medical certainty as necessary under Pennsylvania law. (N.T. at 193.) Therefore, part one of *Mitzelfelt's* holding is here satisfied.

Dr. Cervia also gave sufficient testimony to establish that such negligence increased the risk of the harm suffered, as required under part two of *Mitzelfelt's* holding. Under direct examination, Dr. Cervia made the following comments:

"Q: What is your opinion as to these different failures that you've mentioned to diagnose the condition and treat the condition with antibiotics, what is your opinion as to whether or not that was a substantial factor in causing the conditions that led to Mr. Callari's death?

"A: I believe that they did contribute, yes.

"Q: As a substantial factor?

"A: Yes, I would say so.

"Q: Did the actions increase the risk of harm that eventually took place?

"A: I would say they did, yes." (N.T. at 201-202.)

Dr. Cervia also testified that he was making each one of these statements with a reasonable degree of medical certainty. (N.T. at 193.) Therefore, his testimony satisfies the second part of *Miltzelfelt's* holding.

Because Mr. Callari did, in fact, suffer from the harm that Dr. Cervia testified he was placed in risk of suffering, this court properly submitted this case to the jury. The same bacteria found in Mr. Callari in October 1996—enterococcus faecalis—can develop into endocarditis. (N.T. at 181.) Tests revealed that he had enterococcus faecalis in his system in March of 1997. (N.T. at 178.) Mr. Callari subsequently died from enterococcus faecalis

endocarditis on April 6, 1997. (N.T. at 181.) Although the expert witnesses disagreed on whether the infection in 1996 actually caused the endocarditis that was diagnosed in March 1997, this dispute does not prevent this case from going to the jury. The fact that Dr. Cervia stated that he could not be certain whether Dr. Rosenwasser failed to totally eradicate Mr. Callari's infection in October 1996 also does not preclude this case from being submitted to the jury. Pursuant to *Mitzelfelt,* it is the jury's duty to balance the probabilities as to whether Dr. Rosenwasser's negligence proximately caused Mr. Callari's harm and eventual death. Dr. Cervia testified that he believed, with a reasonable degree of medical certainty, that Dr. Rosenwasser's actions increased the risk of harm to Mr. Callari. Therefore, his testimony satisfied the standard as set forth in *Mitzelfelt,* and this court, pursuant to *Mitzelfelt,* submitted this case to the jury.

Finally, Dr. Rosenwasser avers that this court abused its discretion when it ruled on his motion for post-trial relief without scheduling oral argument and without giving the parties the opportunity to brief the issues raised. Pursuant to Pennsylvania Rules of Civil Procedure, Rule 227.1(b)(2), grounds not specified in post-trial motions are deemed waived. Because there is no evidence in the record before this court that suggests Dr. Rosenwasser requested an oral argument or an opportunity to brief the issues raised in his post-trial motions, such requests have been waived. See *Fred E. Young Inc. v. Brush Mountain Sportsmen's Association,* 697 A.2d 984, 993 (Pa. Super. 1997) (holding that appellant waives issues regarding a trial court's decision to decide post-trial motions without oral argument or permitting reply brief after trial if issues are not raised in post-trial motions). Furthermore,

because Dr. Rosenwasser did not raise these issues in the lower court and instead is raising these issues for the first time on appeal, he is prevented from doing so pursuant to Pa.R.A.P. 302(a).

Moreover, Dr. Rosenwasser did in fact have an opportunity to fully argue the issues he raised in his post-trial motions during trial. He had the opportunity to brief the issue regarding the admissibility of Dr. Cervia as an expert witness in his motion in limine. Dr. Rosenwasser orally argued that issue when he renewed his motion in limine during Dr. Cervia's voir dire examination. (N.T. at 158-59.) This issue was again revisited when Dr. Rosenwasser made his motion for compulsory nonsuit. (N.T. 11/6/02 at 56-57.) Also during his motion for compulsory nonsuit, Dr. Rosenwasser orally argued that Dr. Cervia failed to testify with a reasonable degree of medical certainty as to causation. (N.T. at 57.) "There is no authority [that] grants a party the right to oral argument after trial." *Young,* 697 A.2d at 993. Furthermore, "the filing of trial memoranda is a matter to be exclusively decided by the trial judge." *Young,* 697 A.2d at 994. For these reasons, the trial court did not abuse its discretion in not scheduling additional oral arguments or in not allowing the parties to additionally brief the issues raised in Dr. Rosenwasser's motion for post-trial relief.

## CONCLUSION

For the reasons set forth above, this court respectfully requests the Superior Court to affirm its February 3, 2003 denial of defendant/appellant's motion for post-trial relief.