575 A.2d 607

Sandra L. HATBOB and Darlene L. River, Appellants,

v.

Reginald BROWN and James L. Nardelli, Appellees.

Superior Court of Pennsylvania.

Argued March 20, 1990.

Filed May 16, 1990.

James R. Walker, Pittsburgh, for appellants.
James R. Farley, Pittsburgh, for Brown, appellee.

Stephanie G. Spaulding, Pittsburgh, for Nardelli, appellee.

Before CAVANAUGH, DEL SOLE and HUDOCK, JJ.

CAVANAUGH, Judge.

The issues in this case are whether the court below properly entered non-suits against the appellants, Sandra L. Hatbob and Darlene River, in their actions for breach of contract against a testator who changed his will, and for legal malpractice against the attorney who prepared the will that was subsequently changed.

After the appellants, the plaintiffs below, concluded their case in chief in a jury trial before Louik, J., the court entered a non-suit in favor of the appellees. The motion of the appellants to remove the non-suits was denied and an appeal has been taken to this court.

A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff's evidence. *Francioni v. Gibsonia Truck Corp.*, 472 Pa. 362, 372 A.2d 736 (1977). It may be entered only in cases where it is clear that the plaintiff has not established a cause of action, giving the plaintiff the benefit of all favorable evidence and all reasonable inferences arising from the evidence. *Storm v. Golden*, 371 Pa.Super. 368, 538 A.2d 61 (1988). However, a jury may not be permitted to reach its verdict based on speculation or conjecture. *Smith v. Bell Telephone Co.*, 397 Pa. 134, 153 A.2d 477 (1959). A judgment of non-suit is properly entered if the plaintiff has not introduced evidence sufficient to establish the necessary elements to maintain an action. *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983). Further, it is the duty of the trial judge to determine, prior to submitting the case to the jury, whether the plaintiff has met this burden. *Thomas v. Ribble*, 404 Pa. 296, 172 A.2d 280 (1961).

Viewing the evidence in the light most favorable to the appellants, it appears that in December, 1973, Reginald Brown contacted James L. Nardelli, an attorney whom he

knew, and requested that simple wills be prepared for him and his wife. At this time, Mr. Nardelli had not yet met Mrs. Brown. The attorney conferred with Mr. and Mrs. Brown on December 26, 1973. Mr. Nardelli knew that Mr. and Mrs. Brown had been previously married and that Mrs. Brown had two children by her previous marriage, Sandra Hatbob and Darlene L. River, the appellants herein, and Mr. Brown had a daughter, Elizabeth G. Smith (who is now Elizabeth Stevvins). Mr. Brown told his lawyer that he and his wife would soon be moving to Florida and he instructed Mr. Nardelli to prepare separate wills. The testamentary disposition was uncomplicated and Mr. Brown left his entire estate to Mrs. Brown, if she survived him by sixty days, and if not, his estte was to go in equal shares, to his two stepdaughters, Sandra Hatbob and Darlene River, and his daughter, Elizabeth G. Smith. Mrs. Brown executed a similar will leaving her estate to her husband, if he survived her by sixty days, and if not, then in equal shares to her two daughters and stepdaughter.[1] Both wills were dated December 31, 1973. Mr. Nardelli advised the Browns to have their wills reviewed by a Florida attorney, as they were moving to that state shortly after the wills were executed. They did not have the wills reviewed by an attorney in Florida.

Mr. Brown testified that he did not discuss his financial affairs with Mr. Nardelli, but merely told him who the

---

1. The relevant sections of Mrs. Brown's will are as follows:

SECOND: I hereby give, devise and bequeath all the rest, residue and remainder of my estate both real, personal and mixed of whatsoever kind and wheresoever situate to my husband, Reginald Brown.

THIRD: In the event that my husband, Reginald Brown, should predecease me, die simultaneously with me or die within sixty (60) days of my death, I then give, devise and bequeath my entire estate to my daughter, Sandra L. Hatbob, my daughter, Darlene L. River, and my stepdaughter, Elizabeth G. Smith, in equal shares, share and share alike. In the event that any child or stepchild of mine, as enumerated above, shall have predeceased me, then, in that event, I direct that the share of my estate which would have otherwise passed to said deceased child or stepchild shall then pass to the children of said deceased child or stepchild, per stirpes and not per capita.

beneficiaries were to be. The will expressed his intentions at the time it was signed and he was sure it also expressed his wife's intentions. Mr. Brown understood that he could change his will in the future. Mr. Nardelli also believed that the wills could be changed by either party at any time in the future.

Mrs. Brown died in Florida in April, 1985 and Mr. Brown inherited her entire estate under the December, 1973 will. Subsequently, Mr. Brown executed new wills in which he left his estate to his daughter, Elizabeth S. Stevvins. In March, 1986, the appellants commenced a civil action in Allegheny County against Mr. Brown, alleging breach of contract by making a new will and against James L. Nardelli for negligence.

Following the presentation of the plaintiffs' case in the court below, the appellees' motion for compulsory non-suit was granted. By order dated June 26, 1989, the court refused to take off the non-suit and this appeal followed.

In order to consider the propriety of the court's refusal to submit the case to the jury, we must consider the evidence in support of the appellants' claim that there was an enforceable oral contract to make wills that could not be changed by the testators. The appellants must meet the exacting evidentiary burdens placed by law upon one who would establish an oral contract to make a will. *Friedman Estate*, 483 Pa. 614, 398 A.2d 615 (1978). These requirements were summarized in *Fahringer v. Strine Estate*, 420 Pa. 48, 53–55, 216 A.2d 82, 85–86 (1966) as follows:

Certain rules have been established in this area of the law: (a) a contract to make a will or to bequeath by will, as other contracts, must be established by proof of an offer, an acceptance and legal consideration (*Reynolds v. Williams*, 282 Pa. 148, 127 A. 473; *Kocher Estate*, 354 Pa. 81, 46 A.2d 488; *Goldstein Estate*, 384 Pa. 1, 119 A.2d 278); (b) the terms of the contract must be shown with certainty and lucidity (*Soffee v. Hall*, 377 Pa. 306, 105 A.2d 144; *Hook's Estate*, 207 Pa. 203, 56 A. 428); (c) the evidence must be scrutinized with great care (*Burgess*

v. Burgess, 109 Pa. 312, 1 A. 167; Bradshaw's Estate, 243 Pa. 114, 89 A. 831; Strafford v. Reed, supra, [363 Pa. 405, 70 A.2d 345]); (d) there must be 'direct evidence' in proof of the contract (Calvert v. Eberly, 302 Pa. 152, 156, 153 A. 146; Consentino v. Vittoria, 394 Pa. 538, 541, 147 A.2d 839); (e) as in the case of other claims against a decedent's estate, the evidence in proof of the contract, must be 'clear, direct, precise and convincing' (Petro v. Secary Estate, 403 Pa. 540, 170 A.2d 325; Klemow Estate, 411 Pa. 136, 140, 191 A.2d 365); ...

The only witnesses who testified as to what occurred at the office of attorney Nardelli about the circumstances surrounding the making of the wills were Reginald Brown and Mr. Nardelli. Neither testified as to any contract to make irrevocable wills. Mr. Brown and Mr. Nardelli both understood that the wills could be changed at any time.[2]

**2.** The testimony of attorney Nardelli was as follows:

Q. At any time during your meeting with Reginald Brown and Irene Brown on December 26, 1973, did you ask either of them whether they wanted to place any restrictions on the ability of the surviving spouse to change the wills that they had asked you to prepare or to change the disposition of assets that was being set forth in the wills you were asked to prepare?
A. There was no such discussion initiated by either Mr. or Mrs. Brown or myself. Nor did any such discussion take place.

. . . . .

Q. At the time that you prepared, in December of 1973, the wills of Reginald Brown and Irene Brown, did you understand, or did you have an understanding whether the surviving spouse would be entitled to change his or her will, or to change the disposition of assets set forth in his or her will?
A. There would have been no doubt in my mind then or now that either party could have independently changed the wills that I drafted.

Mr. Brown testified as follows:

Q. And did your will as it was drafted for you by Mr. Nardelli, did that document express your wishes at that time?
A. It did.
Q. And as far as you know, did your wife's will, Irene Brown's will, express her wishes at that time?
A. I'm sure it did.
Q. Did you ever have an intention—or was it ever your intention that you would not be able to change that will?
A. No.

The appellants contend that Reginald Brown breached a verbal contract with his wife to create an irrevocable plan of distribution for their estates. Evidence offered to support this alleged agreement included the testimony of Mrs. Hatbob, who testified:

Q. Now, where were you, Sandy? You were telling us about—?

A. Well, we were talking about what would happen if they died and mother was explaining—she told me that they were going to be buried together, that their wills were the same, and we started to talk about a few things that would happen and she told me—. *I asked her actually what would happen if she died first? We hadn't talked about that, either.*

*And she said, well, not to worry; that her will stated everything went to Brownie and then, upon his death, everything went to the three of us.*

And I said, "Yes, Mom, but what happens if you do die first? Is there anyway that Dad and Betty Jean could possibly change it or screw my sister and me?"

She said, *"No, Sandy. My will takes care of that." She said, "It can't be changed."*

And after that there was no reason to talk to her about it. She stated the fact, and once you are told, you are told. Why would you ask again? (Emphasis added.)

The appellants rely on the testimony of Floyd River, the husband of Darlene River, who was present in Florida with Mr. and Mrs. Brown. Mr. River testified:

Q. Do you have any knowledge as to whether it was Mrs. Brown's intention, Irene Brown's intention, that she would never be able to change her will?
A. No. As far as I know, we never discussed anything after we made the wills. Never have I discussed—the only time we talked about it was Jim [Nardelli] advised us to take them to a Florida lawyer, which we never did.
Q. Do you recall—.
A. At one time we did talk and we talked about getting a lawyer in Florida to remake the wills.
Q. And you never came to them or any other firm here in Florida to review the wills that Mr. Nardelli had drafted for you?
A. No.

Q. Did she say anything further about the wills and the arrangement that—?

A. What she said was that they—they both wanted their wills this way and the fact that the wills couldn't be changed. They both agreed upon this; they were happy with their wills the way they were written up and they couldn't change them. She said, "If Mr. Brown should die first, then I am obligated to see to it that I keep the will the same and to see to it when I die that Sandy gets one third share and Darlene gets her third share and Mrs. Stevvins get her third share." She also went on to say that Mr. Brown had that same obligation.

Q. Okay. Did she read to you from the wills?

A. No.

Q. During this conversation?

A. No.

Q. Who participated? Do you recall the Defendant, Reginald Brown, having any participation in this conversation? I think that you indicated he was present, was he not?

A. Yes, he was present.

Q. Okay.

A. The only participation he took in the conversation was he acknowledged what she said on several occasions. He didn't add anything to the conversation or enter into it. But at various times she would look over to him and say, "Isn't that right, Brownie?" And he would say, "Yes, yes, that is right." He would acknowledge the facts she was saying. He was listening to it somewhat. He wasn't—I felt that Mr. Brown had heard it all before and he was aware of the situation and he was aware of the way —.

The appellants also rely on the testimony of Darlene River, one of the appellants, who testified as follows:

Q. When did you first find out anything about the wills and estate plan that had been made between Irene and Reginald?

A. Well, I knew in December of '73 that she had gotten wills made.

Q. You knew about the fact that she had done that?

A. That that is what they had done, whenever they were up here in '73, that they had made an appointment and had wills drawn up.

Q. Did you know anything about what the will said at that point?

A. Not at that point, no.

Q. When is the first time you found out anything about what the plan was?

A. Certain dates, certain times of the year, I can not say. It was just a general over-the-year conversation, that these wills were drawn up, *that these were virtually the same, that, upon the death of the one, his estate would go to the survivor, and then to the three children in equal shares.* (Emphasis added.)

Finally, appellants rely on the testimony of James Nardelli as evidence of an agreement not to revoke or change the wills. Mr. Nardelli's relevant testimony was:

Q. Did you have any particular or normal procedure that you followed, prior to December of 1973, in preparing wills of spouses, when those spouses had been parties to previous marriages or had had children in connection with previous marriages?

A. As I recall in this particular instance, Mr. and Mrs. Brown had already formulated in their own minds the fact that the three children, I will refer to them as children collectively, were to be treated equally, and that was an initial statement to me, and therefore I did not inquire further into it. There was no reason to.

Q. And in connection with that statement, were you told specifically that the three children were to be treated equally at or upon the death of the surviving spouse?

A. *Yes, as reflected in my notes and in the wills as drafted.* (Emphasis added.)

The appellants also rely upon the following answer by Mr. Nardelli:

Q. And you had the opinion or understanding at the time that Reginald Brown and Irene Brown had previously reached such a predetermined understanding?

A. Very definitely.[3]

The wills before us were signed on December 31, 1973 and are clear and unambiguous. The heavy burden that appellants had to meet was to establish that the parties contracted not to change their wills in the future. They did not produce sufficient evidence to submit this issue to the jury.

 Wills are, by nature, revocable. The Probate, Estates and Fiduciary Code, 20 Pa.C.S. § 2505 expressly provides for the revocation of a will: "by some other will or codicil in writing." There is no doubt that Reginald Brown has intended to revoke his will of December 31, 1973 by virtue of his later wills. Even though the December, 1973 wills were mutual and made at the same time, this does not prevent revocation in the absence of a clear and definite contract established by proof of an express agreement or unequivocal circumstances. *Rhodes Estate,* 277 Pa. 450, 121 A. 327 (1924). There is no real difference between an agreement not to revoke a will and an agreement to make a will. As stated in *Fahringer v. Strine Estate,* 420 Pa. at 52, 216 A.2d at 85: "... because of the opportunity such alleged contracts [to make a will] afford for the presentation of false and fraudulent claims, traditionally the courts have been reluctant to give recognition to such contracts and have viewed claims based on such contracts with misgivings and suspicion." *See also, Vajentic Estate,* 453 Pa. 1, 306 A.2d 300 (1973). An oral agreement to make a will must be established by evidence that is clear, precise and indubitable. *Kelly v. Sheehan,* 378 Pa. 33, 105 A.2d 706 (1954). This means that the witnesses must be credible,

---

3. The understanding that Mr. Nardelli was referring to was that the three children were to receive equal shares as provided for in the wills he prepared.

distinctly remember the facts to which they testify, and narrate the details with exactitude. *Stafford v. Reed,* 363 Pa. 405, 70 A.2d 345 (1950).

In the absence of a valid contract, the concurrent signing of reciprocal wills "with full knowledge of the contents, by both testators, is not enough to establish a legal obligation to forbear revocation." *Kester Estate,* 477 Pa. 243, 250, 383 A.2d 914, 918 (1978), quoting from *Rhodes Estate,* 277 Pa. 450, 453, 121 A. 327 (1923). *Imbruglia Estate,* 479 Pa. 95, 387 A.2d 851 (1978) involved reciprocal wills in which each spouse stated that the will was made in consideration of the will of the other spouse. Each will provided that if a spouse predeceased, certain real estate would be given to named individuals. The wife predeceased and the husband then executed a new will, naming different beneficiaries. Upon the death of the husband, the original beneficiaries sued, claiming an enforceable agreement not to revoke. The court noted that while the husband and wife devised each of their estates in a similar manner, and stated a "consideration" of the other's act of writing a similar will, neither writing demonstrated an intent to give up their right to revoke the wills. The evidence was held to not meet the demanding standards of proof of a contract not to revoke.

We must contrast the will before us and that in *Curry v. Thompson Estate,* 332 Pa.Super. 364, 367–68, 481 A.2d 658, 659 (1984). In that case, there were reciprocal wills made by a husband and wife. The wife's will provided, *inter alia:* "The wills are identical since it is our intention and we hereby agree that the wills are to remain unchanged upon consideration of receiving more than our Intestate share of each other's estate." After the husband died, the wife made a new will with different provisions. We held that the contract not to revoke could be discerned from the face of the will and no extrinsic evidence was necessary to establish the contract. However, as noted in *Kester Estate,* 477 Pa. at 251, 383 A.2d at 918:

When it is claimed that someone has contractually limited his testamentary freedom, our standard of proof is a demanding one. In the case of a joint will in which extrinsic evidence is relied upon to prove the existence of a contract, we held that the proof must be 'clear and convincing'.

The evidence submitted by the appellants does not approach the standard of clear, precise and indubitable evidence. The wills give no indication that the parties intended them to be irrevocable. The scrivener, Mr. Nardelli, and one of the testators believed that they could be changed. The evidence submitted established at best that Mrs. Brown thought that the wills could not be changed. Although her will was simple and clear, Darlene River testified that her mother told her that the way the wills were drawn up, "upon the death of the one, his estate would go to the survivor, and then to the three children in equal shares." The will does not provide this. To reach this result would require that we rewrite the wills as the appellants' interpretation envisions a life estate only to the survivor with a remainder interest in the children. The wills devised and bequeathed an absolute interest in each spouse's property and did not provide for the creation of a trust.

The hearsay statements attributed to Irene Brown indicate only a vague and inaccurate understanding of her will, and do not set forth a precise and definite contract not to revoke the wills. Mrs. Hatbob testified that her mother told her that the will said "everything went to Brownie and then upon his death, everything went to the three of us." When Mrs. Hatbob asked her mother if Reginald Brown could change his will, she allegedly replied that he could not; "my will takes care of that ... it can't be changed."

The strongest evidence to establish an agreement not to revoke was the testimony of Floyd River. This was based on hearsay evidence of statements made by Mrs. Brown allegedly in the presence of Reginald Brown. Nevertheless, Mr. Brown did not participate in the conversations but was only "somewhat" listening. The conversation between Mr.

and Mrs. Brown and Mr. River did not establish a promise not to revoke supported by valid consideration. Casting the conversation in the light most favorable to the appellants, it does not establish the basic elements of a contract consisting of an offer, acceptance and consideration by direct, clear and convincing evidence. The requirements set forth in *Fahringer v. Strine Estate, supra,* must be strictly met and the evidence submitted fell far short of this.

The appellants also contend that the court erred in refusing to admit the deposition of a Florida attorney, Michael E. Hoover, regarding his conversation with Benjamin G. Parks, also an attorney in Florida. The appellants contend that Mr. Hoover's deposition would have established that Mr. Parks, who represented Mr. Brown in Florida in connection with the administration of his wife's estate, stated that Mr. Brown told him that Mr. Brown entered into an agreement to make mutual wills.[4] The admission of evidence is within the sound discretion of the court and the court's decision will not be reversed in the absence of a clear abuse of discretion. *Lewis v. Pruitt,* 337 Pa.Super. 419, 487 A.2d 16 (1985); *McCrery v. Scioli,* 336 Pa.Super. 455, 485 A.2d 1170 (1984). We find no abuse of discretion in excluding the testimony which the court below found to be irrelevant. The court determined that at best it would merely show an agreement to make wills and this was carried out. Mr. Brown was not present when Mr. Parks made the alleged statements and they would not be binding on Mr. Brown. If admissions are made out of court and not in the presence of the client, authority to make the

---

**4.** The deposition of Mr. Hoover that counsel for the appellants desired to have admitted was this:

THE COURT: A statement that says this: " 'and I asked him, What do you mean that it doesn't matter, and he said, well, Mr. Hoover, are you aware that the parties entered into a mutual will agreement on December 31, 1973?' And I recall that very specifically because *it really caught me off guard,* and prior to that point in time, there had been no indication by anybody to me, that there had been such a mutual will agreement."

Now, is that what you are offering as an admission?

MR. WALKER: [Counsel for Plaintiffs below] Yes.

MR. WALKER: By his attorney.

admissions or the knowledge, and assent of the client to make them must be shown. *DeFrancesco v. Western Pennsylvania Water Co.*, 329 Pa.Super. 508, 478 A.2d 1295 (1985). Mr. Brown denied specifically making a contract not to revoke or change his will and no authority was shown from Mr. Brown to make the alleged admissions. In any event, the proposed depositions did not establish a contract not to revoke the wills.

Finally, the court committed no error in granting the appellees' motion for compulsory non-suit in the action against James L. Nardelli for malpractice. When we reach the issue of whether a purported beneficiary under a will, who is not a party to the underlying contract between the testator and his attorney, may bring an action in Pennsylvania for malpractice against the attorney, we enter seas that are not clearly charted. In *Connelly v. Wolf, Block, Schorr & Solis–Cohen*, 463 F.Supp. 914 (E.D.Pa.1978) it was noted that for a plaintiff to recover against an attorney in a legal malpractice case, it was generally essential that an attorney-client relationship exist between the parties. However, the Supreme Court in *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983) held that a named legatee under a will may bring suit as an intended third-party beneficiary of the contract between the attorney and the testator for the drafting of the will which specifically named the legatee as the recipient of part of the estate. The court also held that privity of contract between the attorney and client is required in order to bring an action in negligence for professional malpractice.[5] In *Guy v. Liederbach*, the plaintiff was designated as a beneficiary and executrix under the testator's will. The attorney directed her to witness the testator's will and as a result, her legacy and appointment as executrix were void under New Jersey law where the testator resided. The lower court dismissed the suit which

---

5. In *Eisenberg v. Gagnon*, 766 F.2d 770, 779 (C.A.3 1985), the court stated: "In Pennsylvania malpractice liability for negligent performance of legal services generally extends only to the lawyers' clients", but referred to *Guy v. Liederback, supra,* which allows claims of third party party beneficiaries.

was based on assumpsit and negligence theories and the Supreme Court remanded holding that the named legatee could bring an action as a third party beneficiary under Restatement (Second) of Contracts, § 302. The court held that only a named beneficiary could bring such a suit.[6]

The Supreme Court, in the recent case of *Hicks v. Saboe*, 521 Pa. 380, 385, 555 A.2d 1241, 1244 (1989): considered *Guy v. Liederbach* in the context of an uninsured person's action against a title company. The court held that direct liability to an uninsured third party was precluded. The court in discussing *Guy v. Liederbach* stated:

Following the principles set forth in the Restatement (Second) of Contracts, the Court permitted a restricted cause of action for an intended third party beneficiary who was not in privity with the professional whose malpractice harmed the beneficiary. It was critical that the beneficiary was an *intended* beneficiary, that is, one

6. Mr. Justice Roberts dissented stating at 501 Pa. 65–66, 459 A.2d 754:

As decedent was under no contractual obligation to make a will which named appellee as a beneficiary, decedent was thus free to change his testamentary intent until the day he died. *See, e.g., Imbruglia Estate*, 479 Pa. 85, 95, 387 A.2d 851 (1978).

. . . . . .

Here, the record is clear that appellant [the lawyer] and decedent did *not* intend that appellant would render services to appellee; the sole promise which appellant made to decedent was to write decedent's will, a promise which appellant performed.

Although appellant fairly may be charged with having impliedly promised decedent that the execution of the will would be conducted in a manner that would not result in the nullification of the bequest to appellee, decedent's relief for a breach of such a promise would have been either a new, properly executed will or the cost of having such a will prepared.

. . . . . .

Appellee's [beneficiary and executrix] demand for far greater relief than that which would have been available to decedent *makes it clear that what appellee is seeking to enforce is, in fact, not a promise made between appellant and decedent under the law of contracts, but rather an alleged duty owed by appellant directly to appellee under the law of torts.* Having properly refused to recognize such a duty in a cause of action in trespass, the majority has offered no logical basis for its imposition of a similar duty as a purported application of third-party beneficiary law. (Emphasis added.)

intended by the promisee to receive the benefit of the promised performance.

We do not construe this as permitting a malpractice action based merely on negligence against an attorney where there is no privity of contract. The complaint against Mr. Nardelli alleges a breach of contract between him and the appellants, but the thrust of the complaint is that the appellants suffered the loss of the sum of "$198,-901.65 which is the value of the estate of Irene A. Brown which has been lost to them because of defendant, James L. Nardelli's *negligence* as aforesaid." (Emphasis added.) The Statement of Issues Presented refers to "Mr. Nardelli's negligence in the drafting of wills for defendant Brown and his wife ..." Clearly, the case was presented as a legal malpractice action based on negligence. Appellants' brief relies on *Schenkel v. Monheit*, 266 Pa.Super. 396, 405 A.2d 493 (1979), which involved a malpractice claim against an attorney where there was privity of contract.

However, our decision does not turn on the fine point that appellants endeavored to prove malpractice based on negligence rather than breach of contract. We are satisfied that appellants did not establish a breach of contract between Mr. Nardelli and the testators. When attorney Nardelli prepared wills for Mr. and Mrs. Brown, he carried out the instructions of the testators. The named legatees received nothing less than the testators intended as expressed by their wills. When Mrs. Brown died, Mr. Brown inherited her entire estate without any limitation. Had Mr. Brown died first, and the wills remained the same, then Mrs. Brown would have been the sole beneficiary under his will. She could have left her will as it was in 1973 if she so desired, but would have been under no legal compulsion to do so.

In order for the appellants to recover as third-party beneficiaries, they would have to show a breach of contract between Mr. Nardelli and the testators. In the case of a testator-attorney contract the attorney is the promisor who promises to draft a will which carries out the testator's

intent to benefit the legatees. *Guy v. Liederbach, supra.* No evidence was introduced to indicate that Mr. Nardelli did not carry out Mrs. Brown's intention to benefit the appellants. We have determined that there was no contract to make Mr. and Mrs. Brown's wills irrevocable and Mr. Brown testified that the will exactly expressed his intent at the time it was made, and Mrs. Brown's intent also at that time.

Under *Guy v. Liederbach, supra,* the appellants are precluded from recovery on the basis of alleged malpractice of Mr. Nardelli, as this remedy requires the existence of an attorney-client relationship. While they could proceed as third-party beneficiaries on the theory of breach of contract, there was not sufficient evidence to warrant submission of this issue to the jury.

Order affirmed.