Robert GOLDEN, Attorney–in–Fact for
Leah Golden and Donald Earwood,
Executor of the Estate of Helen Ear-
wood, Plaintiffs,

v.

Nicholas J. COOK, Esquire
and Leskinen & Cook,
Defendants.

No. CIV.A.02–1300.

United States District Court,
W.D. Pennsylvania.

Dec. 2, 2003.

Joel W. Todd, Esquire, Dolchin, Slotkin & Todd, Philadelphia, PA, for Plaintiffs.

David L. Haber, Esquire, Weinheimer, Schadel & Haber, Pittsburgh, PA, for Defendants.

## OPINION

CERCONE, District Judge.

Plaintiffs commenced this diversity action seeking monetary damages based on their status as third party beneficiaries of a contract between defendants and one of their clients. Under the terms of the contract defendants agreed to provide the client with estate planning documents. Plaintiffs specifically contend that defendants are liable as a result of Nicholas J. Cook, Esquire's ("Attorney Cook") failure to investigate the circumstances under which an addendum to various trust documents initially drafted by Attorney Cook came into existence, which addendum drastically reduced plaintiffs' proportional shares under the initial testamentary scheme reflected in the estate planning documents prepared by Attorney Cook, thus resulting in plaintiffs' claimed damages. Presently before the court is defendants' motion to dismiss. For the reasons set forth below, the motion will be granted.

Plaintiff Leah Golden ("Mrs.Golden"), an elderly individual who is incapable of car-

ing for herself and a resident of New York, is the sister-in-law of plaintiff Helen Earwood and David Golden. Complaint at ¶¶ 1 & 11. She was also the sister-in-law of the late Mrs. Irene I. King, who died on July 26, 2000 ("decedent"). *Id.* at ¶¶ 13 & 45. Plaintiff Helen Earwood ("Mrs.Earwood"), an elderly individual who is suffering from dementia, incapable of caring for herself and a resident of Georgia, is the sister of David Golden and decedent. *Id.* at ¶¶ 2 & 10. Decedent was a resident of Fayette County, Pennsylvania, and her brother, David Golden, lived in close proximity to her. *Id.* at ¶¶ 13 & 8.

On August 20, 1999, decedent, then 95 years of age, called upon the services of Attorney Cook for the purpose of planning her estate. *Id.* at ¶¶ 15, 19, 20. At that time decedent was in relatively good health and capable of managing her own affairs. *Id.* at ¶¶ 16–18. David Golden accompanied decedent to Attorney Cook's office. *Id.* at ¶ 19. David Golden and Attorney Cook had been co-parishioners in a local church and David Golden referred decedent to Attorney Cook. *Id.* at 23.

In accordance with decedent's expressed wishes, Attorney Cook prepared a trust, last will and testament, deed and two powers of attorney ("the trust documents"). *Id.* at 24. After reviewing the trust documents decedent executed them on September 1, 1999. *Id.* at ¶¶ 26–30. Decedent transferred all of her property to the trust, in which she designated herself "trustee." *Id.* at ¶ 32. Under the terms of the trust, upon decedent's death her estate was to be divided in equal one-third shares among Mrs. Golden, Mrs. Earwood and David Golden, provided each legatee was still living. *Id.* at ¶ 34. Decedent named contingent beneficiaries in the event Mrs. Golden and David Golden did not survive her. *Id.* at ¶ 35. Specifically, Mrs. Golden's one-third share would pass to her sons

and David Golden's one-third share would pass to his wife, or if she too were deceased, to David Golden's son and daughter. *Id.* at ¶ 36. Decedent's last will and testament provided that upon her death her property would pass under the terms of the trust and David Golden would serve as executor of the estate. *Id.* at ¶ 37. The trust also provided that in the event of decedent's incompetency/incapacity David Golden would serve as the successor or alternate trustee. *Id.* at ¶ 33.

Decedent paid Attorney Cook $500.00 for the estate planning documents. *Id.* at ¶ 25. Attorney Cook was well aware that David Golden was and would be assisting decedent in completing and executing the trust documents and knew that David Golden was quite knowledgeable about trust and estate matters. *Id.* at ¶ 28, 31, 39 & 42. After preparing the trust documents Attorney Cook forwarded them to decedent and asked her to scrutinize them for consistency with her expressed intentions. *Id.* at 27. Under the trust documents prepared by Attorney Cook each plaintiff was to receive one-third of decedent's estate upon her death. *Id.* at ¶ 34. Following the decedent's execution of the trust documents on September 1, 1999, in Attorney Cook's office, Attorney Cook never corresponded with decedent again. *Id.* at ¶ 43.

On June 19, 2000, David Golden met with Attorney Cook to advise him of some recent behavior on the part of decedent. Attorney Cook memorialized the conversation as follows:

> David said that several weeks ago his sister Irene instructed him to withdraw $15,000 from the bank and to place $5,000 in an envelope for Helen, $5,000 in an envelope for Leah and $5,000 in an envelope for David. David still has those three envelopes in his possession.

*Id.* at ¶ 64–65. Thereafter decedent instructed David Golden to obtain three $18,000 cashiers checks, each one made payable to a separate legatee. Decedent initially kept the checks in her possession and thereafter told David Golden to deposit Mrs. Golden and Mrs. Earwood's check into decedent's account. Decedent retained possession of the check made payable to David Golden. *Id.* at ¶ 66. Through these relayed events Attorney Cook became aware that decedent had "allegedly engaged in bizarre behavior that altered drastically the testamentary scheme created by the trust documents." *Id.* at ¶ 67.

On June 27, 2000, ten months after decedent executed the trust documents, a caregiver of decedent, Darlene Koposko, hand delivered to Attorney Cook's office a hand written, one page document that purported to be an amendment to the trust documents. *Id.* at ¶¶ 46–47. The addendum was executed on June 14, 2000, and reduced Mrs. Earwood's one-third share of decedent's estate to a $10,000 bequest, Mrs. Golden's one-third share to a $5,000 bequest and increased David Golden's one-third share to the entire residue of the estate. The addendum was silent as to any contingent beneficiary named in the original trust documents. *Id.* at 53. The one page addendum was purportedly signed by decedent and witnessed by Koposko and Donald Flowers. *Id.* at ¶ 47 (incorporating Addendum as exhibit "B" to the Complaint).

Upon receipt of the addendum Attorney Cook was provided with a document indicating that his 96 year old client had, with a swipe of the pen, significantly changed the trust documents for which the decedent had paid Attorney Cook $500 to draft, and contrary to the testamentary scheme therein, had virtually disinherited two of the three intended beneficiaries. At the same time, the addendum bestowed upon David Golden almost all of decedent's estate. Despite this significant change of heart, and the simple,. holographic instrument virtually undoing the entire trust documents which Attorney Cook had been paid to create, Attorney Cook did not undertake any efforts to contact decedent or investigate the circumstances under which the addendum came into existence and/or its authenticity. *Id.* at ¶ 54–58. Attorney Cook likewise did not undertake any effort to convert the holographic instrument into an "official" document. *Id.* at ¶ 59.

Plaintiffs contend that the circumstances confronting Attorney Cook in June of 2000 obligated him to investigate the manner and means by which the addendum came into existence and whether it actually reflected decedent's true testamentary intent. Plaintiffs surmise that had Attorney Cook performed this duty, he would have discovered that as a result of decedent's age and feeble condition, she had become a victim of undue influence. Attorney Cook breached his duty to investigate the matter, however, which in turn permitted the addendum to supplant the duly prepared and properly executed trust documents. *Id.* at 69. As a consequence of Attorney Cook's breach each plaintiff has been denied her full and intended legacy under the trust documents. *Id.* at ¶¶ 72–73. At the time of decedent's demise, the estate was worth over $200,000. *Id.* at ¶ 50.

Defendants move to dismiss on a variety of grounds. They contend this court lacks subject matter jurisdiction because the inheritance tax return filed with the Register of Wills in Fayette County on June 7, 2001, reflects a gross value of the estate of approximately $209,000, and a net value after expenses of $188,000. In light of this official document, Mrs. Earwood's claimed losses would be one-third of the estate minus $10,000, or $53,000; and Mrs. Gold-

en's losses would be one-third of the net minus $5,000, or $58,000; and both amounts are below the amount in controversy threshold for diversity jurisdiction. In addition, plaintiffs assertedly lack standing to pursue a legal malpractice claim under the limited third party beneficiary exception recognized in *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983), and defendants purportedly could not have been the cause of any harm to plaintiffs in any event.

Plaintiffs contend they fall squarely within the limited third party beneficiary exception for disappointed legatees established by *Guy,* and assert they have otherwise demonstrated that Attorney Cook's failure to investigate the circumstances surrounding the addendum breached his promise to draft documents which would effectuate decedent's true testamentary intent. Had Attorney Cook exercised reasonable care in the execution of his duties, he purportedly would have learned that the addendum was a product of undue influence, and would have been able to thwart the unlawful effort by David Golden to manipulate decedent's estate, resulting in the estate passing through the trust documents and permitting plaintiffs to receive their rightful share of decedent's estate.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). Dismissal of a complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v.*

*Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Langford v. City of Atlantic City,* 235 F.3d 845, 847 (3d Cir. 2000) (*citing Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996)). The question is not whether the plaintiff will ultimately prevail; instead, it is whether the plaintiff can prove any set of facts consistent with the averments of the complaint which would show the plaintiff is entitled to relief. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). Under this standard a complaint will be deemed sufficient if it adequately puts the defendant on notice of the essential elements of a cause of action. *Nami,* 82 F.3d at 66.

While all factual allegations and reasonable inferences to be drawn therefrom are to be accepted as true, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted). In ruling on a 12(b)(6) motion courts consistently have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law" or "sweeping legal conclusions cast in the form of factual allegations." *Id.* at 906 n. 8 (*citing in support* Charles Allen Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed.1997), *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996) ("while the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice") and *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.")).

■ Plaintiffs' complaint will be dismissed for a variety of reasons. First, this court lacks subject matter jurisdiction over

the parties' dispute. As the party invoking federal jurisdiction, plaintiffs have the burden of proving the facts necessary to establish the presence of diversity jurisdiction by a preponderance of the evidence. *Boyer v. Snap–On–Tools,* 913 F.2d 108, 111 (3d Cir.1990). This includes the burden of establishing the amount in controversy. *Meritcare, Inc., v. St. Paul Mercury Ins. Co.,* 166 F.3d 214, 222 (3d Cir. 1999). And "the general federal rule is to decide the amount in controversy from the complaint itself." *Angus v. Shiley, Inc.,* 989 F.2d 142, 145 (3d Cir.1993).

■ Although the focus in assessing a motion to dismiss is on the allegations set forth in the pleadings, "matters of public record, orders [and] exhibits attached to the complaint" also may be considered. *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 2 (3d Cir.1994) (*citing* 5A Wright & Miller, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D, § 1357; *Chester County Intermediate Unit v. Pennsylvania Blue Shield,* 896 F.2d 808, 812 (3d Cir.1990)). In this regard it is well established that courts are permitted to consider matters of which they may take judicial notice, including records and reports of administrative bodies, *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994), and publicly available records and transcripts from judicial proceedings "in related or underlying cases which have a direct relation to the matters at issue." *In re American Continental/Lincoln Sav. & Loan Securities Litigation,* 102 F.3d 1524, 1537 (9th Cir.1996) (*citing, inter alia, Henson v. CSC Credit Services,* 29 F.3d 280, 284 (7th Cir.1994)); *accord Pension Benefit Guaranty Corp. v. White Consolidated Industries,* 998 F.2d 1192, 1196–97 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Kauffman v. Moss,* 420 F.2d 1270, 1274 (3d Cir.); *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27

L.Ed.2d 84 (1970). Defendants have presented the Pennsylvania Inheritance Tax Return for decedent's estate which was filed with the Register of Wills of Fayette County on June 7, 2001. Plaintiffs do not deny the authenticity of this document. The document reflects a gross and net value of the estate which when proportionately divided results in each plaintiff having a claim for less than $75,000.

Plaintiffs seek to overcome this potentially fatal deficiency by contending that Attorney Cook prepared the tax return based upon information provided by David Golden and David Golden actually failed to report two independent bank accounts containing approximately $146,000 which constituted additional property of the estate. Plaintiffs thus contend that decedent's estate has an approximate value of at least $335,000, and as a result each legatee stood to inherit in excess of $111,000 when all the property of the estate is taken into account.

■ The question presented is whether this court may look beyond the tax return and include other assets of the decedent in determining the amount that would have passed to plaintiffs under the trust documents as originally drafted by Attorney Cook. The well-established probate exception to diversity jurisdiction precludes such an undertaking.

■ This court has an unflagging obligation to consider its jurisdiction in probate matters. *Moore v. Graybeal,* 843 F.2d 706, 709 (3d Cir.1988). It has long been settled that federal courts have no jurisdiction to probate a will or administer an estate. *Markham v. Allen,* 326 U.S. 490, 494, 66 S.Ct. 296, 90 L.Ed. 256 (1946). As a consequence of this limitation on the court's diversity jurisdiction, federal courts "do not ordinarily have jurisdiction to set aside a will or the probate thereof." *Moore,* 843 F.2d at 709 (*citing Sutton v.*

*English,* 246 U.S. 199, 38 S.Ct. 254, 62 L.Ed. 664 (1918)). Similarly, the federal appellate courts consistently have recognized that federal diversity jurisdiction may not be used to set aside a testamentary instrument on the bases of incompetency of the testatrix or undue influence. *Id.* (*citing Kausch v. First Wichita Nat. Bank,* 470 F.2d 1068 (5th Cir.1972) and *Turton v. Turton,* 644 F.2d 344 (5th Cir. 1981)). Nor may it be used to interfere with the probate proceedings or [to] assume general jurisdiction of the probate proceedings or control of the property in the custody of the state court. *Id.* (*citing Markham,* 326 U.S. at 494, 66 S.Ct. 296).

■ "Notwithstanding these jurisdictional limitations, if a state authorizes interested parties to bring an *inter partes* action to annul a will or to set aside its probate independent of the probate proceedings and not incidental or ancillary thereto then, assuming there is diversity of citizenship and the requisite amount in controversy, a federal court has jurisdiction over the case." *Id.* (*citing Sutton,* 246 U.S. at 205, 38 S.Ct. 254 and *O'Callaghan v. O'Brien,* 199 U.S. 89, 25 S.Ct. 727, 50 L.Ed. 101 (1905)). This *inter partes* limitation to the general probate exception to diversity jurisdiction permits a federal court to hear matters related to but independent of "pure probate" matters. *Rice v. Rice Foundation,* 610 F.2d 471, 475–76 (7th Cir.1979).

■ The standard to be used in determining whether federal jurisdiction may be exercised under the *inter partes* approach is "whether under state law the dispute would be cognizable only by the probate court." *Id.* If a party would be relegated to presenting the claims to a probate court under state law, then that party's claims are beyond the scope of a federal court's diversity jurisdiction. *Id.* In contrast, if a party's claim may proceed *inter partes* and is enforceable in a state court of general jurisdiction, federal diversity jurisdiction will be found to exist. *Id.* Under this approach federal courts may exercise diversity jurisdiction over actions that "arise out of or pertain to probate proceedings, but are independent in character and not merely incidental or ancillary to the probate." *Id.* (citation omitted). The *inter partes* approach has been adopted by most federal courts which have addressed the issue. *Id.* (collecting cases).

Consistent with the teachings of *Rice,* the United States Court of Appeals for the Third Circuit adopted the *inter partes* approach in *Moore.* "This jurisdiction to hear *inter partes* actions, unlike the jurisdiction over matters not interfering with the probate proceedings or the state control of the estate, requires reference to state practice to determine the scope of federal jurisdiction." *Moore,* 843 F.2d at 709–10.

Under Pennsylvania law the orphans' court division of each court of common pleas has mandatory jurisdiction over decedents' estates, testamentary trusts and *inter vivos* trusts. 20 Pa.C.S. § 711. This jurisdiction encompasses all proceedings for the enforcement of legacies, annuities and charges placed on real or personal property by will, *inter vivos* trust or decree of an orphans' court or for discharge of the lien thereof. *Id.* It also includes all appeals from and proceedings removed from the county's register of wills. *Id.* Thus, it is beyond question that in Pennsylvania "[t]he Orphans' Court has exclusive jurisdiction over the settlement, administration and distribution of a decedent's estate." *Cole v. Wells,* 406 Pa. 81, 177 A.2d 77, 81 (1962) (citation omitted).

■ Under Pennsylvania law the orphans' court has "all legal and equitable powers required for or incidental to the

jurisdiction it exercises." 20 Pa.C.S. § 715; *Cole,* 177 A.2d at 89. It has exclusive jurisdiction over all appeals from the orders and decrees of the register. *Cole,* 177 A.2d at 81. In this regard it has long been recognized that the orphans' court has jurisdiction over all funds of an estate pursuant to its equity jurisdiction, and need not rely on a court of law to bring such matters before it. *See In Re Mulholland's Estate,* 154 Pa. 491, 26 A. 612, 614 (1893) ("[the orphans'] court having jurisdiction over the estates of decedents, it follows the funds of the estate, because of its large equity powers [and] ... need not call in the aid of a court of law."). And the jurisdiction of the orphans' court overs such matters is exclusive. The Supreme Court of Pennsylvania long ago opined:

> While the jurisdiction of the Orphans' Court is restricted to particular subjects,—the estates of decedents and minors,—its powers necessary to the exercise of this jurisdiction are not restricted. Within its domain, they are as unlimited as those of a court of chancery. Over these subjects the jurisdiction is exclusive, and therefore as extensive as the demands of justice. And all persons are amenable to the jurisdiction who have possession of the trust property.

*In re Watts' Estate,* 158 Pa. 1, 27 A. 861, 865–866 (1893). Furthermore, the jurisdiction of the orphans' court over such matters has only been expanded under the Probate, Estates and Fiduciaries Code. *See Estate of Webb,* 391 Pa. 584, 138 A.2d 435, 436–37 (1958); 20 Pa.C.S. § 711(17).

It follows that this court is without jurisdiction to amend or otherwise look beyond the tax return in determining plaintiffs' proportional share of decedent's estate. The determination of whether property of the decedent has not properly been included in the estate is a matter of "pure probate" which is relegated to the exclusive jurisdiction of the Orphans' Court of Fayette County. That court has exclusive jurisdiction over the determination of whether David Golden improperly failed to included assets belonging to the estate resulting in the need to modify the Register's decree. That court likewise possesses the jurisdiction to compel David Golden to account for any deficiency in the final assets of the estate. *See Estate of Meriano v. Commissioner of Internal Revenue Service,* 142 F.3d 651, 660 (3d Cir. 1998) ("the Orphans' Court may direct the estate fiduciary to reimburse the estate if, upon auditing the estate's final account, the court finds the fiduciary's entire distribution to be improper or unreasonable."). To conclude otherwise would result in this court assuming general jurisdiction over the probate proceedings; it would also lead to this court being in control of the property in the custody of the state court. Both of these undertakings are matters expressly beyond the scope of this court's diversity jurisdiction. *Moore,* 843 F.2d at 709.[1] Accordingly, plaintiffs have failed to carry their burden of establishing the amount in controversy.

---

1. Plaintiffs' argument that this court may assume such jurisdiction based on the related action of *Leah Golden and Helen Earwood v. David Golden and Darlene Koposko,* Civil Action No. 01–567, is misplaced for the same reasons. The court has already analyzed the developed record in that action and determined that plaintiffs' claims of undue influence and tortious interference with inheritance, in the form of a "will contest," do not fall within this court's limited *inter partes* jurisdiction. As a result, that action was dismissed for lack of subject matter jurisdiction on March 24, 2003. *See* Opinion and Order of March 24, 2003 (Doc. No. 52) in Civil Action No. 01–576.

Even assuming *arguendo* that this court could exercise diversity jurisdiction over the matters raised by plaintiffs' complaint, defendants' motion to dismiss nevertheless would have to be granted because the allegations in plaintiffs' complaint fail to state a claim upon which relief can be granted. In *Guy*, the Supreme Court of Pennsylvania declined to eliminate the privity requirement in malpractice actions against attorneys based on negligence, and expressly held that a plaintiff "must show an attorney-client relationship or a specific undertaking by the attorney furnishing the professional services ... as a necessary prerequisite for maintaining such suits in trespass." *Guy*, 459 A.2d at 750. The court nevertheless felt compelled to recognize "a properly restricted cause of action" in accordance with the principles of the Restatement (Second) of Contracts § 302 for third party beneficiaries of a contract to make a will that are named legatees who would otherwise have no recourse for the failure to receive their bequests as a result of attorney malpractice. *Id.* at 746. Plaintiffs assert that they fall under this restricted cause of action. The court disagrees.

In *Guy*, an attorney had drafted a will and directed a named beneficiary to witness it. The testator owned property in New Jersey and under that state's law the beneficiary's witnessing of the will voided her entire legacy and her appointment as executrix. Under the court's prior ruling in *Spires v. Hanover Fire Ins. Co.*, 364 Pa. 52, 70 A.2d 828 (1950), a third party beneficiary lacked standing to recover on a contract unless the obligation to the third party was created and affirmatively appeared in the contract itself. Under this rule the legatee in *Guy* could not recover because the drafting attorney did not intend to confer any benefit on the legatee by entering into the contract to draft the will with the testator, and the intent to benefit the legatee did not appear in the contract itself. *Id.* at 750–51. The court overruled *Spires* "to the extent that it states the exclusive test for third party beneficiaries" and adopted the two part test set forth in the Restatement (Second) of Contracts for intended beneficiaries.[2]

The court explained:

There is thus a two part test for determining whether one is an intended third party beneficiary: (1) the recognition of the beneficiary's right must be "appropriate to effectuate the intention of the parties," and (2) the performance must "satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." The first part of the test sets forth a standing requirement. For any suit to be brought, the right to performance must be "appropriate to effectuate the intention of the parties." This general condition restricts the application of the second part of the test, which defines the intended beneficiary as either a creditor beneficiary (§ 302(1)(a)) or a donee beneficiary (§ 302(1)(b)), though these

---

2. Restatement (Second) of Contracts § 302 provides:

**Intended and Incidental Beneficiaries**

(1) Unless otherwise agreed between a promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to perform in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy the obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

terms are not themselves used by [the] Restatement (Second).... The standing requirement leaves discretion with the trial court to determine whether recognition of third party beneficiary status would be "appropriate." If the two steps of the test are met, the beneficiary is an intended beneficiary "unless otherwise agreed between promisor and promisee."

*Id.* at 751. Applying this test in *Guy,* the court observed that recognition of the right to performance in the beneficiary was appropriate because the estate had not been injured by the attorney's malpractice and could not or would not bring suit. In addition, the will served to verify that the testator intended the named beneficiary to have the benefit of the attorney's promised performance, that is to draft a will which would benefit the named legatee. In adopting this approach, the court emphasized that "although a plaintiff on a third party beneficiary theory in contract may in some cases have to show a deviation from the standard of care, as in negligence, to establish breech, the class of persons to whom [the attorney] may be liable is restricted by principles of contract law, not negligence principles relating to foreseeability or scope of the risk." *Id.* at 751.

Plaintiffs argue that they fall within the limited class of third party beneficiaries recognized in *Guy* because they were names legatees who were to receive a part of the decedent's estate under the trust documents and defendants assertedly breached a duty by failing to insure that plaintiffs received the benefit of Attorney Cook's promised performance of drafting estate planning documents that effectuated the decedent's intent. Plaintiffs fail to meet either prong of the two part test.

 Plaintiffs lack standing to pursue a breach of contract claim against defendants. Reaching the conclusion that recognition of third party beneficiary status in plaintiffs is "appropriate" to effectuate the intention of the contracting parties would be tantamount to converting the attorney-client relationship between Attorney Cook and decedent into a relationship where Attorney Cook's paramount duty would be to serve plaintiffs' interests. The appellate courts have declined to extend *Guy* in such a manner and the current record lacks any justification for doing so.

In *Gregg v. Lindsay,* 437 Pa.Super. 206, 649 A.2d 935 (1994), the Superior Court declined to recognize third party beneficiary standing under sufficiently analogous circumstances. There, an attorney, Lindsay, drafted a will for the decedent, Blane, in which a friend of Lindsay was named as the sole beneficiary and executrix. The will was thereafter duly executed. The testator was admitted to the hospital five years later, and confined to extensive care following a double femoral bypass. While there, he was visited by his longtime friend, James Gregg.

During Gregg's visit with Blane, Gregg raised the matter of a will. According to Gregg, after some discussion Blane directed him to contact Lindsay and have him draft a new will providing for a substantial bequest to Gregg and also naming Gregg as executor. Also to be included in the will were two charitable bequests. Gregg then called Lindsay, emphasized the seriousness of the Blane's medical condition, and informed Lindsay of the need to draft and execute a new will immediately. Linsday complied with the request and visited Blane at the hospital that evening with a draft of the new will.

When Lindsay raised the matter of the new will with Blane, he seemed to be unconcerned about the document but did say that the revised will was acceptable. Finding these circumstances unusual,

Lindsay recommended that the execution of the will be witnessed by two subscribing witnesses. Lindsay was unable to find such witnesses at the hospital at the time and suggested that he should return the following morning. Blane did not object to this procedure and Lindsay left and did not return until shortly after 12:00 noon the following day. When Lindsay arrived he discovered that Blane had been transferred to another hospital where he died later that afternoon.

Gregg subsequently filed a civil action against Lindsay seeking to predicate liability based upon his standing as a third party beneficiary to the agreement between Blane and Lindsay. After reviewing the standards set forth in *Guy* and other applicable cases by the Superior Court, the court concluded that recognition of third party beneficiary standing in the context of testamentary dispositions "is warranted only when the circumstances are analogous to those in *Guy* or are equally compelling." *Id.* at 938 (*citing Manor Junior College v. Kaller's Inc.*, 352 Pa.Super. 310, 507 A.2d 1245, 1248 (1986)). The court framed the issues as follows:

> The issue before this court in the instant case is whether *Guy* should be expanded to allow recovery where, as here, (1) the new will was never executed by the testator, and (2) the facts send a mixed signal regarding the person to whom the lawyer owed a primary duty of loyalty.

*Id.* at 938, 507 A.2d 1245. After reviewing pertinent case law from other jurisdictions, the court concluded that recognizing third party beneficiary status under the circumstances "would open the doors to mischief of the worst type" due to its impact on the duty of loyalty owed by a lawyer to the client and its propensity to encourage fraudulent claims. *Id.*

The court in *Gregg* based its holding in part on *Espinosa v. Sparber, Shevin, Shapo, Rosen & Heilbronner*, 586 So.2d 1221, 1223 (Fla.App.1991), *aff'd*, 612 So.2d 1378 (Fla.1993). There, the defendant/lawyer had prepared a new will at the client's request which named as an additional beneficiary a daughter who had been born after the execution of the client's prior will. A dispute arose concerning the value of the estate and before it was revolved the client died without having executed the new will. The daughter then sued the lawyer, seeking to establish third party beneficiary status. The court declined to recognize the cause of action, holding that the daughter was not permitted to rely on expressive evidence that the testator's intent was other than as expressed in his validly executed will. Consequently, the court held that a third party action in such settings should be limited to those instances in which the lawyer's conduct had frustrated an intent expressed in the executed will itself, because to hold otherwise would fail to protect the integrity of solemnly executed wills and encourage fraudulent claims. *Id.* at 1223–1124.[3] The *Gregg* court found this reasoning compelling, and concluded that because the testator's conduct conveyed equivocal intentions to the lawyer, a disappointed beneficiary could not base a cause of action on an instrument which, although drafted by the lawyer, did not become the instrument governing the testator's estate.

The Superior Court of Pennsylvania similarly refused to recognize third party beneficiary standing in *Cardenas v. Schober*, 783 A.2d 317 (Pa.Super.2001). There, the testator died and her will was duly

---

**3.** In *Guy,* the testamentary instrument upon which third party beneficiary status was found to exist was the testator's only executed will, which clearly and unequivocally established an intent by the testator to benefit the legatee.

admitted to probate, with letters testamentary being issued to the executor immediately thereafter. The parties seeking to avail themselves of third party beneficiary status claimed that the testator attempted to execute another will leaving them substantial monetary legacies, and the testator had made a hand written document leaving one of the plaintiffs personal property. They contended that the testator expected the defendant/lawyer to have these documents drawn up as a new will, and the lawyer failed to do so or failed to do so effectively. After further proceedings before the orphans' court, the plaintiffs conceded they could not prevail in a will contest. They then commenced legal causes of action in the court of common pleas, which were dismissed pursuant to the defendant/lawyer's preliminary objections.

After reviewing the principles set forth in *Guy* and *Gregg*, the *Cardenas* court concluded the plaintiffs did not fall within the narrow class of legatees that may bring suit under the third party beneficiary theory. The court opined:

First, as appellants admit, the documents, or testamentary writings, written by Ms. Harper do not constitute an "otherwise valid will." *Gregg, supra.* In *Guy,* our Supreme Court indicated third party beneficiary status was appropriate for the plaintiff because in that case, the attorney who drafted the will directed the plaintiff to be a subscribing witness which voided her legacy. However, the will was an otherwise legally valid will in that it was executed by the decedent with due formalities and clearly set forth the decedent's intent to benefit the named legatees. The Court reasoned that the plaintiff, a legatee, should not be precluded from recovering against the attorney because of a lack of privity between the legatee and attorney.

Here, there is no question that the documents written by Ms. Harper, which evidence her intent to give appellants more than that which was indicated in her probated will, do not constitute an "otherwise valid will." Appellants admit, and there is no doubt, these documents lack the requisite formalities prescribed for the execution of a valid will. *See* 20 Pa.C.S. § 2502. Appellants contend these documents were to be transformed into a legally valid will by appellee. This is insufficient to meet the requirement that there must be an otherwise valid will.

*Cardenas,* 783 A.2d at 323. The court reasoned that "consequently, appellants may not use [the non-probated instruments] to claim third party beneficiary status." *Id.*

Here, plaintiffs seek to claim third party beneficiary status based upon written provisions that are not part of the decedent's probated will. To be sure, this court must assume that when Attorney Cook drafted the trust documents and decedent executed them, they did constitute decedent's valid testamentary documents which designated plaintiffs as decedent's intended beneficiaries. But *inter vivos* trusts, which are by nature irrevocable, are revocable where the power to do is reserved in the instrument itself. *Kraft v. Neuffer,* 202 Pa. 558, 52 A. 100 (1902). And where this power has been reserved and is subsequently shown to have been exercised, it will be honored. *In re Estate of Thompson's,* 416 Pa. 249, 206 A.2d 21, 26 (1965). Such a revocation may be created by an inconsistent disposition of property through a subsequently executed will. *In re Johnson's Trust,* 435 Pa. 303, 255 A.2d 571, 576–77 (1969) (subsequent testamentary disposition displaces prior intended disposition when subsequent one is plainly inconsistent with initial disposition).

Decedent retained the right to revoke the equitable interests conveyed to plaintiffs in the trust documents. *See* ¶ 8 of Decedent's Living Trust, attached as deposition exhibit 3 to Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss (Doc. No. 12). The handwritten addendum to the trust documents expressly sets forth "changes to [decedent's] living trust" and contained legacies that were expressly inconsistent with the prior gifts made in the trust documents. Thus at the time of decedent's death the potential testamentary instruments failed to convey a clear and unequivocal intent to benefit plaintiffs to the degree initially reflected in the trust documents and "consequently, [plaintiffs] may not use them to claim third party beneficiary status." *Cardenas*, 783 A.2d at 323; *accord Hicks v. Saboe*, 521 Pa. 380, 555 A.2d 1241, 1244 (1989) ("it was critical that the beneficiary was the *intended* beneficiary, that is, one intended by the promisee to receive the benefit of the promised performance [in *Guy* and here] [t]here is no indication of a similar intent on the part of the Saboes to benefit Mrs. Hicks. Thus the exception of *Guy* ... does not apply in this case..."); *Scarpitti v. Weborg*, 530 Pa. 366, 609 A.2d 147, 151 (1992) ("although part of what made a cause of action appropriate in *Guy* was the fact that Mrs. Guy would have been left without recourse or remedy if we denied her third party status, the critical point in *Guy* was that the beneficiary was an *intended* beneficiary, intended by the promisee to receive the benefit of the promised performance."); *Cf. Gregg*, 649 A.2d at 940 ("here, however, there was no executed will which, under such an analysis, could clearly establish an intent by the testator to benefit the third person.").

Plaintiffs complaint is subject to dismissal on the merits for a second fundamental reason: defendants breached no duty to either the decedent or plaintiffs. In *Guy*, the court expressly noted that even in a third party beneficiary action a plaintiff would have the burden of showing "a deviation of a standard of care, as in negligence, to establish a breach ...." *Guy*, 459 A.2d at 752. Attorney Cook was employed by decedent to draft the trust documents which she executed on September 1, 1999. Decedent confirmed that those documents reflected her intention at the time, and by implication confirmed that Attorney Cook had carried out her expressed instructions. Plaintiffs received nothing less than the decedent intended them to receive in the trust documents. Under these circumstances, plaintiffs may not show a breach of contract between decedent and defendants. *See Hatbob v. Brown*, 394 Pa.Super. 234, 575 A.2d 607, 615 (1990) ("in order for the appellants to recover as third-party beneficiaries, they would have to show a breach of contract between [the attorney] and the testators [and] no evidence was introduced to indicate that [the attorney] did not carry out [the testators'] intention to benefit the appellants.").

■ Plaintiffs' implicit contention that the trust documents created a duty in Attorney Cook to protect plaintiffs' interests thereunder from subsequent revocation by decedent is specious and without legal support. Plaintiffs specifically argue:

Defendants have argued that Cook was not retained to perform any task beyond that of preparing the original trust documents, and he is therefore under no obligation to investigate the circumstances surrounding the addendum. This argument must fail. Cook not only was retained to draft the trust documents, but he was retained for the purpose of insuring that decedent's estate was distributed in a manner consistent with her intent. Upon his receipt of the addendum, it would be immediately

clear that the hastily prepared home spun will was completely at odds with decedent's original intent. Because the addendum, if legitimate, would render the terms of the trust documents null and void, Cook's promise to decedent had been compromised. However, in order to insure that the terms of his promised performance, the trust documents, had been legitimately altered such that he would not be derelict in his duties, Cook was obligated to confirm decedent's apparent "new" wishes. Plaintiff's Brief in Opposition (Doc. No. 12) at 16. The court disagrees.

Attorney Cook owed a duty of loyalty to decedent. His contractual obligation was to draft estate planning documents that reflected decedent's expressed intent. He fulfilled that duty when decedent approved the trust documents and executed them on September 1, 1999. Decedent had a lawful right to revoke the property conveyed through the trust documents under Pennsylvania law. She never called upon Attorney Cook to assist her in exercising that right. Obligating Attorney Cook to verify the circumstances surrounding any subsequent exercise of that expressly reserved right would impose on him and all other attorneys the virtually unexhausting responsibility of monitoring and following-up on each client's intent and understanding each time the attorney becomes aware of the possibility that the client may have decided to make a change to a will or trust, in order to assure the proper preservation of the initial objects of the client's bounty, a proposition which has been widely rejected for sound ethical and legal principles. *See Gregg*, 649 A.2d at 939–941.[4]

For the reasons set forth above, defendants' motion to dismiss will be granted. An appropriate order will follow.

## ORDER OF COURT

AND NOW this 2nd day of December, 2003, for the reasons set forth in the opinion filed this day, IT IS ORDERED that defendants' motion to dismiss (Doc. No. 8) be, and the same hereby is, granted. The clerk shall close this case.

---

**4.** Even assuming Attorney Cook had an obligation to investigate the circumstances under which decedent exercised her lawful right to change the dispositions in her revocable trust, plaintiffs' claim would still fail because any such failure to investigate could not be found to be the proximate cause of plaintiff's injury. As defendants note, they are not judge and jury of decedent's testamentary capacity at the time the addendum was executed. Resolution of the validity of the addendum and plaintiffs' legacies from decedent are matters of "pure probate" that are exclusively reserved for the Orphans' Court of Fayette County. *See* Opinion and Order of March 24, 2003 (Doc. No. 52), in *Leah Golden and Helen Earwood v. David Golden and Darlene Koposko*, Civil Action No. 01–567. It is purely speculative to assume that had Attorney Cook advised decedent about the possible implications from the execution of the addendum, decedent would have revoked it. As is evident from a review of the Pennsylvania cases discussed above, liability based upon third party beneficiary status cannot be predicated on such speculation.